In re Gustavo Adolfo MANZANARES, Debtor.

Gustavo Adolfo Manzanares, Plaintiff,

v.

State Farm Fire and Casualty Company, Defendant.

Bankruptcy No. 04–10876–BKC–LMI.
Adversary No. 05–1185–BKC–LMI–A.

United States Bankruptcy Court, S.D. Florida.

May 24, 2006.

Victor K. Rones, Rones and Navarro, N. Miami Beach, FL, for plaintiff.

Benjamine Reid, Carlton Fields, P.A., Miami, FL, for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

This bankruptcy case began when the debtor filed a chapter 7 petition on February 5, 2004. The present dispute predates the bankruptcy, however, and unfortunately for all involved it did not die when the debtor received a discharge on May 6, 2004. What originated as a simple two-car accident and an obligation that both parties acknowledge would have been a dischargeable debt has devolved into an amazing comedy of errors featuring a dueling stream of accusations of improper service, lack of notice, violations of the discharge, and legal arguments about the propriety of the debtor's request for punitive damages against the defendant, State Farm Fire and Casualty Company. Ultimately, the case illustrates that when Hubert Humphrey once observed, "We believe that to err is human; to blame it on someone else is politics," he might as well have been speaking of litigation. In that regard, it is the Court's obligation to decipher which party bears the brunt of the blame for this litigious miasma.

The dispute began simply enough. On December 31, 2001, Mercedes Rondon and Roberto Diaz were in a car accident. Rondon was at fault and was driving a car owned by the debtor, who is her father-in-law. Neither she nor the debtor were insured at the time of the accident. Further complicating matters, Diaz was also driving a vehicle owned by someone else, namely, Maria Lopez and Loynaz Cordova. Both Diaz and the car's owners were insured by State Farm.[1] Diaz suffered injuries as a result of the accident, and there was also damage to the car. As the personal injury and collision damages were suffered by two separate insured parties, however, State Farm elected to deal with the claims separately.[2]

After deducting the $500 deductible required under Lopez's insurance policy, State Farm paid roughly $7,000 in collision damages to Lopez for damage to the car. Meanwhile, after exhausting the $10,000 in personal injury benefits available under his State Farm policy, Diaz also made a claim for uninsured motorist benefits. State Farm paid Diaz approximately $4,200 under this portion of his policy. State Farm then referred both matters to its "subrogation unit." From there, the Lopez claim was referred to an outside attorney, Stephen Shenkman, for collection. Shenkman initiated a subrogation action in state court against the debtor and Rondon, seeking to collect $7,552.36 in damages. Shortly thereafter, the Diaz claim was referred to the law offices of Odalys Nodarse–Buscemi, who brought an action against the debtor and Rondon in November of 2003 to collect the $4,200 in uninsured motorist benefits.

After these actions were filed, the debtor filed bankruptcy in February of 2004. The second lawsuit involving the Diaz uninsured motorist claim was listed on the debtor's schedules. Notice of the bank-

---

1. This coincidence can only be considered unfortunate, as everything else in the case springs from this one simple fact.

2. There is some evidence in the record that both "claims" might have initially been processed under one State Farm claim number. For whatever reason, it did not stay that way.

ruptcy was sent to State Farm's attorney, Odalys Nodarse–Buscemi. As State Farm notes numerous times in its pleadings and during argument, no notice was sent directly to State Farm or to Shenkman, the attorney representing State Farm in the collision subrogation action. However, Nodarse–Buscemi notified State Farm of the bankruptcy filing, and a representative in State Farm's subrogation department instructed Nodarse–Buscemi to dismiss the UM lawsuit because of it.

The competing complaints about poor or ineffective service arise at this point. State Farm accurately contends that the debtor did not list the collision subrogation action in his schedules, and that Shenkman did not receive personal notice of the bankruptcy. According to the debtor, however, service of the collision subrogation lawsuit (handled by Shenkman) was delivered to a residence owned by his former spouse, and the debtor never received notice of the lawsuit. From the debtor's perspective, he was only aware of one lawsuit—the Diaz uninsured motorist action—and that is what he scheduled.[3]

In any event, Shenkman did not receive notice of the bankruptcy directly from the debtor. Further, State Farm did not notify him that the company had received notice of the bankruptcy in connection with the Diaz lawsuit. Blissfully unaware of the torrent of litigation he was about to unleash, Shenkman negotiated a settlement of the claims against Rondon, the debtor's daughter-in-law. On November 16, 2004, Shenkman obtained a default judgment in favor of State Farm against the debtor in the amount of $9,211.51. In March of 2005, Shenkman sent a letter to the Florida Department of Highway Safety and Motor Vehicles. In this letter, Shenkman informed the DMV that the debtor did not possess the state-mandated insurance on his vehicle. The letter also referenced the default judgment in the Lopez subrogation action, and requested that the DMV suspend the debtor's driver's license.

Unfortunately, some confusion regarding the names of the debtor and his son initially resulted in the suspension of the son's driver's license. Shenkman subsequently requested that the son's license be reinstated and asked again that the debtor's license be suspended. This request was granted on or about May 23, 2005. Two days later, the debtor's attorney contacted Shenkman by letter and enclosed a copy of the debtor's bankruptcy discharge. The debtor's attorney noted that the debt was "dischargeable" and that he intended to reopen the bankruptcy proceedings to effectuate that result.

According to Shenkman and State Farm, there were "immediate" discussions between the debtor's attorney and Shenkman's office to resolve the situation. Shenkman claims that it was his understanding that the debtor's attorney was going to reopen the bankruptcy proceeding and amend the schedules to list this debt. Once that was accomplished, Shenkman agreed to vacate the state court judgment and would direct reinstatement of the driver's license. However, according to the debtor's attorney, the debtor also sought to resolve the matter quickly by offering to

---

**3.** Apparently, both lawsuits were served on the debtor at the residence of his former spouse. The evidence indicates that the debtor never resided at this address, although his son (who shares his name) did. When the Diaz lawsuit was served, it appears that the debtor's son was present and delivered the pleadings to his father. The same cannot be said of the Lopez collision action, and given the evidence of the acrimonious relationship between the debtor and his former spouse (including the entry of a domestic violence injunction), it is perhaps understandable why she did not alert him to the lawsuit.

pay State Farm $2,000.00. Shenkman's office rejected this offer.[4]

On June 22, 2005, the debtor filed this adversary proceeding. State Farm seems to suggest that in doing so the debtor somehow reneged upon the mechanism for resolving the dispute. Admittedly, the debtor did not simply reopen the bankruptcy proceeding and amend the schedules. However, the record clearly demonstrates that the debtor expected Shenkman to take affirmative action once he was presented with evidence that the debt was subject to discharge, if not discharged already. Shenkman did nothing to remedy the situation. Oddly enough, neither did State Farm. Despite being properly served with the adversary complaint, State Farm did not file a timely answer and a default was entered on July 25, 2005.[5] In the interim, the debtor's attorney contacted Shenkman with a proposed stipulation to vacate the state court judgment, and indicated that the stipulation could resolve the adversary proceeding. This offer was likewise rejected.

The debtor also filed a motion in state court to set aside the default judgment based upon the allegedly deficient notice and the intervening bankruptcy. Rather than concede on this point either, State Farm's attorney opposed the motion and delayed the hearing on the matter. When the debtor's motion was heard on August 29, 2005, Shenkman opposed both the request to vacate the judgment and the request to reinstate the debtor's driver's license. The state court deferred ruling on the matter until the bankruptcy court addressed the issue. As indicated previously, however, State Farm had failed to file an answer to the adversary complaint and a clerk's default had been entered. At the adversary pretrial on September 7, 2005, the court granted State Farm's request to vacate the default and allowed the debtor to amend the complaint to add a claim for punitive damages. Only after all of this did State Farm file a motion to vacate the state court final judgment. On October 5, 2005, the debtor finally learned that his driver's license had been reinstated.

At this point, the debtor now asks the Court to award both actual and punitive damages against State Farm for alleged violations of the automatic stay and the discharge injunction. The debtor wants an award of actual damages for the wages lost while he could not work as a delivery driver, as well as for the mental anguish and emotional distress associated with the loss of his driver's license. The debtor also believes that a sizeable punitive damage award and an award of attorney's fees would be appropriate in order to send a message that this type of behavior is unacceptable, and to encourage State Farm and other similarly-situated creditors to reform their policies. In order to do so, however, there are two principal questions which must be resolved. First of all, the Court must consider whether State Farm re-

4. It remains a mystery why this offer was rejected. State Farm denies the allegation that it has a policy of requiring "full payment" on a discharged debt, and also contends that Shenkman did not communicate the offer to State Farm. At trial, Shenkman did not clearly describe the basis for his decision, nor did he outline any counterproposals he made. According to his testimony, rather than accept a monetary settlement in exchange for releasing the judgment, he apparently expected the debtor would reopen the bankruptcy to discharge the debt, at which point State Farm would receive nothing for its pains.

5. According to the debtor, State Farm was served through the Chief Financial Officer of the State of Florida on June 27, 2005. State Farm has not explained why no answer was filed or why it opted not to take any action until September of 2005.

ceived adequate notice of the bankruptcy. Second, the Court must decide whether State Farm is responsible for Shenkman's conduct in the prosecution of the Lopez claim.

As to the first issue, it is clear that the so-called "Lopez claim" was not specifically listed on the debtor's schedules. It is also true that the debtor did not serve a copy of the notice of bankruptcy to State Farm directly through Florida's Department of Financial Services. A notice of suggestion of bankruptcy was filed in the Diaz lawsuit, and State Farm appears to concede that it received actual notice of the bankruptcy as concerns that claim.[6] State Farm seems to concede that if Shenkman had received a similar notice, the Lopez action would likewise have been dismissed as a result of the bankruptcy.

Nonetheless, State Farm argues that the notice to Attorney Nodarse–Buscemi was defective because it did not sufficiently alert State Farm to the possibility that other claims (besides the Diaz lawsuit itself) were affected by the debtor's discharge. State Farm contends that in order to properly provide notice, the debtor would have needed to schedule both claims and serve the notice directly on State Farm itself (or, at the very least, notify both attorneys, which State Farm concedes would constitute "actual knowledge" of the bankruptcy, at least in the context of the individual claims in question). Because of this purported defect in notice,

State Farm believes that the Lopez claim was not affected by the discharge and that the company did not engage in any "willful" violations of either the automatic stay or the discharge injunction.

Section 524 of the bankruptcy code operates as a post-discharge injunction against the collection of debts discharged in bankruptcy, and is appropriately characterized as "the embodiment of the Code's fresh start concept." *In re Riser,* 298 B.R. 469, 472 (Bankr.M.D.Fla.2003); *see also Hardy v. United States (In re Hardy),* 97 F.3d 1384, 1388–89 (11th Cir. 1996); *Mooney v. Green Tree Servicing, LLC (In re Mooney),* 340 B.R. 351 (Bankr. E.D.Tex.2006). As the Supreme Court recently stated, the protection afforded by the discharge is one of the "[c]ritical features of every bankruptcy proceeding." *Cent. Va. Cmty. College v. Katz,* —— U.S. ——, 126 S.Ct. 990, 996, 163 L.Ed.2d 945 (2006). In accordance with the provisions of § 524, a chapter 7 discharge affects all creditors by voiding the debtor's past liability for debts which are subject to the discharge, and permanently enjoins creditors from "chasing" debtors. *Jacobson v. Robert Speece Properties (In re Speece),* 159 B.R. 314 (Bankr.E.D.Cal.1993). Further, a judgment imposing personal liability against a debtor for a discharged debt is not merely voidable, but void. *In re Norvell,* 198 B.R. 697 (Bankr.W.D.Ky.1996); *Costa v. Welch (In re Costa),* 172 B.R. 954 (Bankr.E.D.Cal.1994).[7]

---

6. To the extent that State Farm was to contend otherwise, the Court finds that the facts conclusively demonstrate the receipt of "actual notice" as concerns the Diaz claim. Not only was the notice of bankruptcy delivered to State Farm's attorney in that case, but the attorney provided that notice to a State Farm representative, whom State Farm concedes thereafter authorized the dismissal of the Diaz lawsuit.

7. As the court noted in *Mooney,* the discharge is a "cornerstone" of bankruptcy law, providing debtors with a "new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." 340 B.R. at 351. Given the primacy of the discharge, it must be enforced in order to provide meaningful protection to those seeking refuge in bankruptcy, and a violation of the discharge must be recognized

Under 11 U.S.C. § 523(a)(3), however, there is an exception to discharge for a certain category of debts: namely, those which the debtor did not schedule. One of State Farm's principal arguments is that Shenkman's conduct did not violate the discharge injunction because the debtor did not schedule the Lopez claim and it was therefore not discharged under § 523(a)(3). Specifically, this section provides that an individual debtor may not discharge debts which were:

> [N]either listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—
>
> (A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or
>
> (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.

The primary purpose of this discharge exception is fairness to those creditors who, through no fault of their own, were somehow prejudiced by not having the opportunity to protect their rights and assert their interests. The statute recognizes that such creditors might be prejudiced by being denied either a meaningful participation in the distribution of assets or the ability to challenge the dischargeability of their claim for one of the reasons enumerated in §§ 523(a)(2), (a)(4), and (a)(6).

Consequently, the code contemplates, and § 523(a)(3) codifies, the notion that debtors are expected to exercise reasonable care and diligence in assembling and filing with the bankruptcy court accurate information concerning their creditors. *In re Blossom,* 57 B.R. 285 (Bankr.N.D.Ohio 1986).

In *In re Bowen,* 89 B.R. 800 (Bankr.D.Minn.1988), the court noted that the debtor has an "absolute duty" to identify all persons or entities which may hold or assert claims against the estate. The purpose of this obligation is to provide "adequate notice" to creditors of the potential effect the bankruptcy might have on their rights. *Id.* at 805. As the court stated in *Chanute Prod. Credit Ass'n v. Schicke (In re Schicke),* 290 B.R. 792, 801 (10th Cir. BAP 2003), "[A] debtor who seeks the benefit of a discharge has a duty to notify creditors affected by the discharge of his or her case to allow them an opportunity to object thereto."

Given that the purpose of the exception is one of fundamental fairness, however, the statute also provides that an unscheduled creditor who has "actual knowledge" of the bankruptcy case will nonetheless find its claims discharged. In this regard, the debtor's duty to afford due process to creditors is "counterbalanced by the creditors' duty to object to the discharge of a debt if it has *any* notice or knowledge of a Chapter 7 case prior to the expiration of the time limitation" found in the code and bankruptcy rules. *Id.* at 800. Creditors who have timely, actual knowledge of a case but fail to receive "official" notice of it nonetheless have a burden to come forward before the bar date in order to object to the discharge of their claims. *GAC Enters. v. Medaglia (In re Medaglia),* 52 F.3d 451, 455 (2d Cir.1995). Due

for what it is: the denial of one of the primary

benefits of our bankruptcy system. *Id.*

process is not offended by requiring that a person with actual, timely knowledge of an event "take necessary steps" to preserve its rights. *Id.*

■■■■ The threshold inquiry under § 523(a)(3) is therefore whether the creditor received notice or possessed "actual knowledge" of the bankruptcy case. A creditor who does not receive "formal" notice of the filing of a bankruptcy case but who nonetheless has actual knowledge shortly after the filing will be bound by the discharge. *In re Green,* 876 F.2d 854 (10th Cir.1989). Where a creditor has actual knowledge of the bankruptcy in time to protect its rights, its claim will not be excepted from discharge under § 523(a)(3). *Goodwin v. United States Fid. & Guar. Ins. Co. (In re Goodwin),* 215 B.R. 710 (Bankr.W.D.Tenn.1997). As the court stated in *Bowen:*

> [Section 523(a)(3)] is not intended as a safe haven for creditors with actual knowledge of a pending bankruptcy case who neglect to promptly evaluate and advance their interests in the case. Rather, it is intended to act in organic conjunction with numerous other provisions of the Bankruptcy Code and Rules, which operate on the understanding that debtors and creditors in bankruptcy cases have independent obligations to safeguard their own interests in anticipation of the grant of discharge in bankruptcy. The debtor has an absolute duty to identify and schedule all persons or entities who may hold or assert claims against the bankruptcy estate and, hence, to afford adequate notice to creditor-claimants of the effect of the case on their rights (citations omitted). Once the debtor has done this, or once an unscheduled creditor has received actual notice of the pendency of a bankruptcy case, the creditor-claimant has the clear obligation to take affirmative

steps to evaluate, advance, and protect its rights.

89 B.R. at 805.

■■■■ Put most simply, creditors who learn of a debtor's bankruptcy are not entitled to sit back and demand "formal" notice. Their claims are subject to discharge unless they take affirmative action in the face of their knowledge. For purposes of the statute, "actual knowledge" means that the creditor possessed knowledge of facts sufficient to apprise the creditor that a case was actually filed, and where the proceeding was pending. *In re Layman,* 131 B.R. 495 (M.D.Fla.1991). In a case involving an unscheduled creditor who sought an extension of time in which to file a nondischargeability action, the Eleventh Circuit stated:

> The statutory language clearly contemplates that mere knowledge of a pending bankruptcy proceeding is sufficient to bar the claim of a creditor who took no action, whether or not that creditor received official notice from the court of various pertinent dates. This furthers the bankruptcy policy of affording a "fresh start" to the debtor by preventing a creditor, who knew of a proceeding but who did not receive formal notification, from standing back, allowing the bankruptcy action to proceed without adjudication of his claim, and then asserting that the debt owed to him is undischargeable.

*In re Alton,* 837 F.2d 457, 460 (11th Cir. 1988). In *Alton,* the court concluded that "once warned of the bankruptcy proceeding," the unscheduled creditor could have made "a minimal effort" to ascertain the last date to object to discharge and did not do so. *Id.* at 461. Accordingly, his claims were discharged.

■■■ The present case was a no asset chapter 7, in which there was never a date by which creditors were to file proofs of

claim. State Farm does not allege that its claim was subject to any of the exceptions to discharge found in § 523(a)(2), (a)(4), or (a)(6). Not only did one of State Farm's attorneys receive notice of the bankruptcy, but that attorney forwarded the notice to a representative in State Farm's subrogation unit shortly thereafter. State Farm was clearly apprised of the bankruptcy well in advance of the debtor's discharge. All of this would seemingly suggest that *both* of State Farm's subrogation lawsuits were discharged in the debtor's bankruptcy. However, State Farm asserts that its size as a behemoth of the insurance industry justifies the conclusion that the notice was defective and that it did not have sufficient "actual knowledge" of the bankruptcy so as to discharge the Lopez claim.

On a purely factual level, State Farm offers up a series of what it believes to be salient details. For example, State Farm's subrogation unit handles "tens of thousands" of claims a year. The Lopez and Diaz claims were separated internally, handled by different claims representatives, and farmed out to different attorneys to litigate. There was apparently no coordination between the claims agents or the attorneys. According to State Farm's corporate representative, the actions were separated as they involved "separate policies, separate insureds, separate types of claims, separate investigations, and sought separate types of damages."[8] State Farm

complains that because the debtor sent the notice of the bankruptcy to the attorney, rather than to State Farm directly, "there was no process in place" to communicate the matter "to the company as a whole" or to alert the claims representative that other claims might be affected.[9]

As indicated previously, this is not the typical § 523(a)(3) case in which the debtor utterly fails to schedule a creditor. State Farm was in fact scheduled, and the notice went to the attorney handling one of the two subrogation matters. State Farm's argument is that this notice was somehow inherently defective (and that the claims representative's "knowledge" of the bankruptcy in the context of the Diaz lawsuit cannot satisfy the code's "actual knowledge" requirement). There are indeed scenarios under which defective notice to a large company can prevent the discharge of a debt. For example, in *National Union Fire Ins. Co. v. Main (In re Main)*, 157 B.R. 786 (W.D.Pa.1992), the debtor listed nothing more than the creditor's name and a street address. The court noted that National Union was a company with over 30,000 employees, and that "upon receipt of the notice in its mailroom, [they] would not have been able to determine the person within the corporation to whom the notice should have been forwarded in order to determine what action, if any, should be taken with regard to the notice." *Id.* at 788.[10]

---

**8.** As noted during the trial, however, it would appear that at least initially these claims were assigned the same claim number by State Farm's centralized subrogation unit. From the record, it appears that State Farm's decision to "split" the actions was largely a matter of administrative convenience.

**9.** Intriguingly, this contention seems to be contradicted by Shenkman's own testimony, in which he states that he has handled subrogation matters for State Farm for approximately 20 years, and "cannot recall any in-

stance where State Farm advised me about a bankruptcy relating to one of my cases." According to Shenkman, he "usually" receives bankruptcy notices on behalf of State Farm in the context of his subrogation cases, and he then informs the company about the bankruptcy.

**10.** This can be contrasted to the present case, in which a litigation attorney and a subrogation claims representative were both informed of the bankruptcy.

■ Clearly, a creditor who has been "incorrectly" listed in the debtor's bankruptcy schedules is often properly treated in similar fashion to the creditor who was not listed at all. As the court noted in *In re Compton*, 891 F.2d 1180, 1184 (5th Cir. 1990), a deficient listing leaves a creditor "in the same position as unscheduled creditors" if the deficiency results in a lack of notice. In the context of § 523(a)(3), if a debtor incorrectly lists the name or address of a creditor so as to cause the creditor not to receive notice, the creditor's debt has not been "duly scheduled," and if the creditor has no actual knowledge of the bankruptcy, the creditor's debt is not dischargeable. *Id.; see also In re Adams*, 734 F.2d 1094, 1098 (5th Cir.1984). However, it is hardly "deficient" to send notice of the bankruptcy to the attorney handling a claim, as the attorney is normally the creditor's agent in the context of the litigation. *Schicke*, 290 B.R. at 801; *see also Alton*, 837 F.2d at 461 (notice of bankruptcy served on creditor's attorney sufficient to require creditor to contest dischargeability).

■ Serving the notice of bankruptcy upon the attorney may not strictly conform with the requirements of Fed. R. Bankr.P. 1007(a), which provides that the debtor must file a list containing the "name and address" of each creditor. The forms promulgated by the Judicial Conference of the United States also indicate that the debtor should list the creditor's name, mailing address, and account number. It must be conceded that listing a creditor in care of an attorney does not properly conform to the letter of these rules. *Barnes v. Sawyer (In re Barnes)*, 326 B.R. 832 (Bankr.

M.D.Ala.2005). At the same time, however, notice to the attorney may well be *sufficient* under the "facts and circumstances" of the particular case. *Id.* at 839. Here, such service is clearly consistent with Shenkman's testimony that the "usual" practice over his twenty year association with State Farm has been for him to receive bankruptcy notices on behalf of the company, which would presumably mirror the experience of other attorneys handling subrogation matters for State Farm.[11] In any event, the attorney who received the notice for State Farm forwarded it to a subrogation representative, and State Farm itself thus "received" notice.

As State Farm has pointed out, there are certainly scenarios under which notice to a single representative might not constitute notice to a huge corporation or governmental agency. *See United States Small Business Admin. v. Bridges*, 894 F.2d 108 (5th Cir.1990); *In re Senall*, 64 B.R. 325 (Bankr.M.D.Fla.1986); *In re Paul*, 194 B.R. 381 (Bankr.D.S.C.1995). In each of these cases, the courts concluded that the creditor had not received sufficient knowledge of the debtor's pending bankruptcy. State Farm contends that the facts of this case are sufficiently aligned with these authorities as to justify a similar result.

In *Bridges*, the debtor was personally obligated on two loans to the Small Business Administration. At the same time, the debtor's corporation was the guarantor on an unrelated loan which was handled by a separate branch of the SBA. Both the corporation and the debtor filed bankruptcy. In the corporate case, the SBA was scheduled as a creditor and received notice

---

11. The debtor has also noted the ironic reality that when State Farm was served with the adversary complaint in accordance with its alleged "preferred" service mechanism, the company failed to answer and a default was entered. In contrast, notice to Attorney Nodarse–Buscemi was forwarded to the company and generated an instruction to dismiss the Diaz lawsuit.

of the bankruptcy. In the personal bankruptcy, however, the SBA was not listed as a creditor and never received any notice of the case. During the course of reviewing documents in the corporate reorganization, an in-house SBA attorney learned of the debtor's personal bankruptcy. This attorney, however, had no involvement with the debtor's personal loans, which were handled by a separate branch office.

When the SBA filed suit to recover on the personal loans, the debtor argued that the SBA had received "actual knowledge" of the bankruptcy and that the claims were discharged. The court first noted that in the context of a large and "cumbersome agency," debtors would be wise to take steps to assure "timely and meaningful notice." 894 F.2d at 111. In that regard, determining whether notice is adequate often depends upon the "facts and circumstances" of the particular case. *Id.* As the *Bridges* court phrased it, the question was whether "the personal knowledge of personnel in a branch SBA office—a branch unconnected and unfamiliar with [the debtor's] indebtedness to the SBA—should be imputed to the SBA under the circumstances presented." The court's conclusion was that it should not:

> A notice from the bankruptcy court of an individual debtor's bankruptcy filing alerts a creditor that it has been scheduled in that individual's bankruptcy case. The SBA received no notices at all regarding [the debtor's] personal bankruptcy, since [the debtor] failed to schedule it as a creditor. Instead, an attorney in a branch office unconnected with the loans made to [the debtor] discovered [the debtor's] name and bankruptcy case number in the caption of documents relating to a joint plan of reorganization filed in an ongoing bankruptcy proceeding of the SBA's known debtor.... It appears that the SBA's Biloxi office ... reasonably as-

sumed that these notices were merely additional documents in the continuing [corporate] bankruptcy.... Such misinformation cannot satisfy the notice requirements envisioned by the Bankruptcy Code or by the fourteenth amendment's due process clause.

*Id.* at 112.

Likewise, in *Senall,* the debtor provided notice of the bankruptcy to a Pasadena branch of the Bank of America National Trust and Savings Association regarding a deficiency claim on an airplane loan. The debtor did not notify the Los Angeles branch of the bank, which served as trustee of a profit sharing plan, of the bankruptcy. The court concluded that notice to one branch was not notice to the other, and stated that "[t]he Debtor never sought to notice the Bank of America in Los Angeles in its capacity as trustee, and the Debtor cannot preclude a challenge to dischargeability because of his own failure to notify and schedule his creditors." 64 B.R. at 327.

Finally, in *Paul* the debtor sought to reopen his case in order to schedule an omitted creditor. The debtor had personally guaranteed an obligation that his partnership owed NationsBank. When he filed bankruptcy, he did not schedule this claim, although he did apparently schedule an unrelated NationsBank credit card debt. The court concluded that the debtor failed to demonstrate that the bank had notice of the bankruptcy in the context of the guaranty. The court also found that the bank would be prejudiced if the case were reopened because it would be impossible for NationsBank to object to the treatment of unsecured creditors under the debtor's confirmed chapter 11 plan. In particular, the court stated:

> To simply allege that NationsBank had notice because a credit card debt was

scheduled ignores the fact that Nations-Bank is a $200 billion dollar lending institution with thousands of employees in several states and numerous divisions responsible for different types of loans and obligations. The Debtor has failed to meet his burden of showing that NationsBank had notice that the Debtor was in bankruptcy and that the Debtor was attempting to discharge the obligation related to the guaranty of payment in the bankruptcy case.

194 B.R. at 384.

State Farm's argument is that it should be treated in a similar fashion. It points out that the two claims involved "separate State Farm policies and insureds." Two separate law firms were involved. Only one local attorney received notice, who then informed "one State Farm claims representative." State Farm contends that as a "large, national insurance company" with thousands of employees and hundreds of offices throughout the United States, it is not only unfair to conclude that State Farm had "actual knowledge" of the debtor's bankruptcy but would also violate State Farm's due process rights.

This, however, is an overly broad reading of the authorities cited, especially under the facts of the case before the Court. As stated in *Bridges,* whether notice to an agency (or, as here, a large, national company) is adequate "depends upon the facts and circumstances of a given case." 894 F.2d at 111. The facts of this case are actually quite different from those found in the cases cited by State Farm. Each of those cases not only involved separate branches or divisions of the creditors, but there was also a dramatic distinction between the character of the obligations at issue.

This is perhaps most notable in *Bridges,* where it was not only important that two different branches of the SBA were involved, but also that one obligation was a corporate debt and the others were personal obligations in the individual debtor's separate case. While State Farm contends that there are two separate subrogation claims at issue here, they stem from the same set of operative facts and are in fact simply two facets of a singular obligation stemming from one automobile accident. State Farm separated the claims for some sort of administrative convenience, but they were not separate transactions nor do they represent truly separate liabilities along the lines of the claims outlined in *Bridges, Senall,* or *Paul.*

Further, while State Farm emphasizes the fact that one seemingly insignificant claims representative received the notice of bankruptcy as regards the Diaz claim, it is important to note that representative's role. This was not a notice delivered to an isolated agent at one of State Farm's numerous branches. This was notice received by a member of State Farm's subrogation unit—the very unit State Farm utilizes to handle the prosecution of subrogation claims. Admittedly, as Mark Weller, State Farm's corporate representative, testified at trial, that unit handles thousands of claims annually. But if, as the *Bridges* court noted, a notice of an individual debtor's bankruptcy "alerts a creditor that it has been scheduled in that individual's bankruptcy case," the Court must determine what to make of the fact that a member of the unit dedicated to the prosecution of subrogation claims learned that State Farm had been scheduled in the debtor's bankruptcy case.

Intriguingly, State Farm's corporate representative testified that State Farm has a system in place which would have avoided further prosecution of the Lopez claim "if State Farm had been properly served in accordance with Florida law." According to Mr. Weller, if the notice of

bankruptcy had been served through Florida's Department of Financial Services, the notice would have been routed to the accounting department. According to Mr. Weller's direct testimony:

> The accounting department then performs a search of State Farm's database, wherein it could determine whether a claim is left open in our subrogation department against the individual that has filed bankruptcy.

What makes this so curious is his subsequent assertion that a claims representative *in that very subrogation department* would seemingly not consider doing the same thing, or that it would not be part of State Farm's standard operating procedure.[12] After all, if a member of State Farm's subrogation department receives notice of an individual debtor's bankruptcy, it is at least notice that all *subrogation* claims against that debtor are potentially subject to discharge, even if it might not be appropriate to extend that notice to other obligations outside the scope of the subrogation unit.

▮▮▮ Indeed, there are a number of cases which reflect the fact that a creditor is not entitled to simply sit back and do nothing with the notice it receives. Once a creditor has received actual notice of the case, the creditor has a clear obligation to take "affirmative steps" to evaluate, advance, and protect its rights. *Bowen,* 89 B.R. at 805. As the Eleventh Circuit has itself stated, once "warned" of a bankruptcy, a creditor cannot rely upon § 523(a)(3) and must instead make at least "minimal effort" to contest the dischargeability of its claims. *Alton,* 837 F.2d at 461. Further,

as long as a creditor is listed in the debtor's initial schedules, the creditor is presumed to be responsible for ascertaining the specific claims it holds. *In re Mandukich,* 87 B.R. 296 (Bankr.S.D.N.Y.1988). Having made no effort to ascertain the extent of its claims against the debtor, State Farm "cannot now properly complain of the consequences" of its inaction. *Alton,* 837 F.2d at 461.

The adequacy of notice often hinges upon the facts of the particular case. *Bridges,* 894 F.2d at 111. Given the possible continuum of notice scenarios, the code of necessity contemplates a balancing of the corresponding obligations of debtors and creditors. The debtor must give the creditor adequate notice of the bankruptcy, and the creditor is then obligated to take reasonable steps to protect its interests. Creditors have a duty to act to protect their rights once they have actual knowledge of the bankruptcy. *Schicke,* 290 B.R. at 801. Here, State Farm really cannot complain that it received inadequate notice of the bankruptcy itself, as both its attorney and its claims representative actively knew of it. The question, really, is whether it was reasonable of State Farm to do nothing more once it learned of the existence of the bankruptcy. In cases such as *Bridges* it was clearly unreasonable to believe that the creditor received sufficient notice as to make it aware that an unrelated claim against another party might be subject to discharge.

In the present case, the Court is compelled to conclude that there is far too much unity in terms of the corporate de-

---

12. This seems even more mysterious given Shenkman's assertion that in twenty years of representing State Farm, the company has never notified him of a pending bankruptcy. Instead, he has "usually" received the notice himself, and forwarded it to the company—ostensibly to the claims representative handling the case. If Shenkman's experience was typical, one must assume that State Farm's asserted "system" catches very few of the notices of bankruptcy served upon litigation counsel. This seems highly counterintuitive, to say the least.

partment which received the notice, the basis for the claims, and the likelihood of possible discharge for the Court to agree with State Farm. The company clearly received sufficient notice to give it both notice and "actual knowledge" of the debtor's bankruptcy proceeding. State Farm received notice, not only to the attorney handling that matter but to a representative of the very unit handling two "claims" that arose from the same set of operative facts. State Farm and its agents simply failed to take sufficient action in the wake of that knowledge. Had they done so, they could have easily prevented the possible violation of the debtor's discharge. To paraphrase the Eleventh Circuit, once it received notice of the debtor's bankruptcy, State Farm's representatives only needed to exercise a "minimal effort" to determine whether the company held additional subrogation claims against the same debtor. *Alton*, 837 F.2d at 461.

It is intriguing to contrast this situation with *Paul*, one of the cases cited by State Farm and the one which is perhaps most analogous to the present situation. In *Paul*, NationsBank's credit card division received notice of the bankruptcy. The debtor's guaranty of a different debt, handled by a different division within the bank, was not scheduled. The court concluded that the guaranty debt was not discharged. Clearly, however, the disparate nature of the obligations was a critical component of the court's decision; it would be difficult to see the same outcome arising if, for example, the debtor owed two debts to the same branch or division of the bank and only scheduled one of them. Similarly, the outcome of *Bridges* or *Senall* might well have been different if the same branch, unit, or division of the creditor was handling both claims. In such a situation, the unscheduled debt would properly be discharged because the division or unit would be obligated to ascertain which "specific debts" it held might be subject to discharge. *Mandukich*, 87 B.R. at 300. The same is true in this case.

When the smoke dissipates from State Farm's arguments, all that is left is a simple reality: the debtor's liability in both lawsuits was premised upon the fact that he was the owner of a vehicle which was involved in one accident. He was not obligated to State Farm on an unrelated debt in some distant forum. There was, in essence, one "debt" comprised of two components. Both lawsuits were handled by the very unit that received notice of the bankruptcy. State Farm chose to sever its claims into separate lawsuits, and thereafter made a conscious decision, through its agents, not to make any effort to determine whether additional subrogation claims might be subject to the debtor's discharge. State Farm clearly had "actual knowledge" of the bankruptcy, and the "unscheduled" Lopez claim was therefore discharged when the debtor received his discharge in May of 2004.

Further, State Farm's efforts to point out the debtor's "failure" to notify it of the bankruptcy in the context of the Lopez claim overlooks one essential fact: the debtor was not aware of the claim. The record conclusively establishes that neither lawsuit was actually served at the debtor's place of residence. They were instead served at the residence of the debtor's former spouse. The evidence is consistent with the debtor's story that his son happened to be at the residence when the Diaz lawsuit was served and took the pleadings to his father. It is notable that the debtor interposed a defense to this lawsuit in state court and subsequently listed it on his bankruptcy schedules. He filed no response to the Lopez lawsuit and did not list it in his bankruptcy petition. This inconsistency in behavior can only be explained by the fact that he did not receive

notice of the Lopez claim. He did not receive notice of the claim because State Farm served it in the wrong place.

Given this, the debtor was undoubtedly unaware of State Farm's unilateral election to separate two claims that arose from the same set of operative facts. When the debtor listed the Diaz claim on his schedules, he clearly listed the only claim he thought State Farm held against him. As such, it is inappropriate to demand that the debtor schedule a debt which he does not realize exists. *See Aetna Cas. & Sur. Co. v. Wilson (In re Wilson)*, 200 B.R. 72 (Bankr.M.D.Fla.1996) (Section 523(a)(3) was not applicable as the creditor was not "known by the Debtor as an entity which was or might assert a claim").

As the Lopez claim was in fact discharged in May of 2004, the Court must now consider whether State Farm violated the discharge injunction. Section 524 provides that the discharge operates as an injunction against the commencement or continuation of an action or any act to "collect, recover, or offset any dischargeable debt." After the debtor's discharge, Shenkman proceeded to take a judgment against the debtor and also took affirmative steps to suspend the debtor's driver's license. The debtor contends that these actions, together with the creditor's apparent recalcitrance about rectifying the situation once alerted to the existence of the discharge, justify the imposition of actual and punitive damages for a "willful" violation of the discharge injunction.[13]

In *Hardy v. United States (In re Hardy)*, 97 F.3d 1384 (11th Cir.1996), the Eleventh Circuit considered the question of a creditor's liability for violating a debtor's discharge. The court noted that § 524 does not expressly provide for anything other than injunctive relief. While declining to ground an award of damages under an "inherent" contempt power, the *Hardy* court nonetheless concluded that a monetary award could be authorized under 11 U.S.C. § 105. Section 105(a) provides that the court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This broad language encompasses any type of order, be it injunctive, compensative, or punitive, as long as it is designed to effectuate the provisions of the code. *Id.* at 1389. As such, a creditor who violates the discharge may be cited for contempt and subject to sanctions. *Id.* at 1389–90.

Under § 105, a creditor may be liable for contempt if it "willfully" violated the discharge injunction. *Id.* at 1390; *see also Jove Eng'g v. IRS*, 92 F.3d 1539 (11th Cir.1996); *Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 193 (9th Cir. 1995). The Eleventh Circuit has adopted a two-part test to determine the willfulness of a creditor's discharge-related conduct. A creditor may be found in contempt if they (a) knew of the discharge and (b) intended the actions which violated the discharge. *Hardy*, 97 F.3d at 1390; *Jove*, 92 F.3d at 1555; *In re Lowthorp*, 332 B.R. 656, 659 (Bankr.M.D.Fla.2005).

It is important to note what this test does not require: namely, specific evidence of the creditor's deliberate intent

---

13. The parties have argued extensively about whether punitive damages may be awarded in this case. State Farm contends that while punitive damages could be awarded for a violation of the automatic stay under § 362, the debtor has not proven that the stay was in fact violated. State Farm also argues that neither 11 U.S.C. § 105 nor the court's "inherent powers" permit the imposition of punitive damages for a discharge violation. As the Court declines to award punitive damages for the factual reasons discussed below, these legal issues are not addressed.

to engage in conduct which violates the discharge. According to the Eleventh Circuit, in the context of civil contempt the inquiry does not focus on the "subjective beliefs or intent" of the creditors, but upon whether their conduct did in fact comply with the order in question. *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir.1990). According to *Hardy*, an award of sanctions for a violation of the discharge may be premised upon the fact that the creditor both received notice of the bankruptcy (and was thus "aware of the discharge injunction") and also intended the actions which violated the discharge. *Hardy*, 97 F.3d at 1390.

■ In this regard, State Farm argues that Shenkman's conduct cannot be imputed to the company for purposes of liability. For example, State Farm's representative stated that the company did not direct Shenkman to obtain a default judgment against the debtor, nor did it tell Shenkman to request the suspension of his driver's license. State Farm contends that the first it learned of *any* of the bankruptcy-related aspects of the Lopez claim was after the debtor filed this adversary proceeding. Accordingly, State Farm suggests that even if it did "know" of the bankruptcy, it did not "intend" to violate the discharge because it never directed Shenkman to do anything.

The debtor acknowledges that Shenkman did not have any personal knowledge of the debtor's bankruptcy. But State

Farm did; as is discussed above, State Farm's subrogation unit had actual knowledge of the debtor's bankruptcy and did nothing about it. Indeed, despite this knowledge, State Farm permitted its agent to continue collection actions against the debtor. State Farm clearly intended that its attorney would prosecute the subrogation claim to the fullest extent permitted by law. According to Shenkman, he handled this case much as he did every other case he prosecuted on behalf of State Farm. And State Farm knew that absent instructions to the contrary, Shenkman would carry out the terms of his representation: he would litigate the subrogation claim if necessary, obtain a judgment if possible, and take steps to collect upon that judgment. State Farm clearly "intended" that Shenkman do these very things, or the file would never have been sent to his office in the first place.[14]

Had Shenkman been the only one notified of the bankruptcy, failed to inform State Farm, and thereafter continued to prosecute the subrogation action, it would be fair to consider whether State Farm should be punished for the actions of an ostensibly "rogue" agent. In the context of this case, however, State Farm itself was aware of the bankruptcy and simply failed to rein in its hired gun. But for State Farm's failure to act, there would have been no judgment, no suspension, and no damage to the debtor. In the

---

14. State Farm contends that it never "directed" Shenkman to do certain things, such as obtain a judgment or seek the suspension of the debtor's license. State Farm also says that it was not informed of the discussions between Shenkman and the debtor after the license was suspended. It seems odd that there would be so little contact between State Farm and its attorney, but ultimately the evidence reflects that Shenkman's instructions from State Farm were to collect the subrogation claim from the debtor, and that is exactly

what Shenkman attempted to do. State Farm's implicit suggestion that somehow Shenkman overstepped the bounds of his authority is somewhat disingenuous given that his principal actions were entirely consistent with the stated purpose of his representation. His subsequent conduct once notified of the bankruptcy discharge is admittedly questionable, but State Farm itself compounded the problem by failing to answer the adversary complaint despite direct service.

context of agency law, this is not a matter of punishing the principal for the actions of a wayward agent. It is instead an example of a principal who failed to adequately inform its agent of known facts—facts which would have dramatically altered the agent's course of conduct.

Pursuant to the "imputed knowledge" rule of agency, knowledge possessed by an agent is often imputed to the principal for purposes of liability under the theory that when an agent acts in the scope of the agency relationship, there is an "identity of interests" between the principal and agent. *See Siharath v. Citifinancial Servs. (In re Siharath),* 285 B.R. 299, 304 (Bankr.D.Minn.2002). State Farm contends that Shenkman's actions, to the extent that they violated the discharge injunction, cannot properly be imputed to the company because Shenkman never communicated the details of his dealings with the debtor to anyone at State Farm. While State Farm may well accurately restate the principle that a client may not be responsible for the willful conduct of an attorney when the client did not direct the specific action in question, that concept as stated is inapplicable to this case. State Farm, the principal, possessed knowledge that Shenkman, the agent, did not have. The question is which of these parties is culpable in the context of the violation of the debtor's discharge.

It is a well-settled tenet of agency law that a principal's undisclosed knowledge is not imputed to the agent. *Id.* As the court stated in *Ago v. Begg, Inc.,* 705 F.Supp. 613, 617–18 (D.D.C.1988), while agency law often holds a principal responsible for knowledge possessed by the agent, "it sensibly does not hold agents responsible for knowledge known only by the principal." The law presumes that an agent will "perform his duty" and inform the principal of any facts acquired in the

scope of the agency relationship, and thus often holds the principal responsible for that knowledge. This rule does not operate in the converse, however, and an agent "cannot be imputed with the information which its principal has failed to give." *Siharath,* 285 B.R. at 304.

In the case of *Faust v. Texaco (In re Faust),* 270 B.R. 310 (Bankr.M.D.Ga.1998), Texaco was served with notice of the debtor's bankruptcy. Nonetheless, the company referred the debtor's account to a debt collection agency. When the debtor sought damages against both Texaco and the debt collector, Texaco argued that it did not have "actual notice" of the bankruptcy. The court disagreed, finding that Texaco did in fact receive the bankruptcy notice and thus willfully violated the debtor's discharge. The court declined to award damages against the debt collector, however, citing the aforementioned rule that an agent cannot be imputed to possess information which the principal failed to provide. *Id.* at 317.

Similarly, in *Siharath,* the creditor received notice of the bankruptcy and attempted to send a letter to its law firm instructing it to cease all collection activities. Unfortunately, the letter was actually sent to the debtor instead of the law firm, and so the attorney continued to pursue collection of the claim, including obtaining a default judgment and sending the debtor a notice of intent to levy upon wages. When the debtor sought damages against both parties, the court granted summary judgment on behalf of the law firm because the attorneys had not been provided with critical information known only to the principal (namely, that the debtor had filed bankruptcy). However, the court allowed the debtor to proceed with certain claims against the creditor, as the court found that the creditor had willfully violated the automatic stay because it

"had knowledge of the commencement of the [debtor's] bankruptcy yet continued, through its agent ... to attempt collection of its debt." 285 B.R. at 305.[15]

▮▮▮ A principal is obligated to provide an agent with adequate instructions and warnings, and a principal may be held responsible for harm which results from the failure to disclose known facts to the agent. *See Restatement (Second) of Agency* §§ 256, 435, 509, and 510. The clear result of all of this is that when a creditor knows of a debtor's bankruptcy and its attorney does not, it is the creditor who must bear the ultimate responsibility for the attorney's collection efforts. If the discharge is violated in such a situation, it must be said to have been violated by the creditor, because it was the creditor who failed to act upon the information in its possession.

▮▮▮ The facts before the Court compel the conclusion that State Farm knew of the debtor's bankruptcy and also intended for its attorney to collect upon the Lopez claim. Clearly, State Farm is responsible for not informing Shenkman of the bankruptcy; State Farm is likewise responsible for the injuries that flowed from Shenkman's pursuit of the subrogation claim in violation of the discharge. An award of compensatory damages and attorney's fees is therefore appropriate. *Hardy*, 97 F.3d at 1390; *see also In re Bock*, 297 B.R. 22 (Bankr.W.D.N.C.2002) (creditor and attorney liable for compensatory damages for

willful violation of discharge); *In re Mooney*, 340 B.R. 351 (Bankr.E.D.Tex.2006) (debtor entitled to reasonable attorney's fees and punitive damages for creditor's willful violation of discharge injunction).

The debtor has requested an award of actual damages for lost wages, emotional distress, and the upheaval associated with the loss of his driver's license. The debtor has also asked for punitive damages and attorney's fees. While State Farm's actions clearly constitute a willful violation of the debtor's discharge, under the peculiar facts of this case it is unclear whether State Farm truly acted with the sort of "egregious, intentional misconduct" generally considered necessary for a punitive damage award. *See Siharath*, 285 B.R. at 305. At the same time, the loss of his driver's license for almost six months and the attendant legal costs associated with finally compelling State Farm to honor the discharge constitute significant harm to the debtor. The court finds that an award commensurate with these injuries should be sufficient to compensate for the severity of State Farm's conduct, and that punitive damages will therefore not be considered.

In addition to the evidence regarding his lost wages, the debtor introduced a "journal" purporting to document his contemporaneous emotional state as he waited for his license to be reinstated. While the journal contains numerous entries which are essentially cut and pasted into the document, several facts cannot be disput-

---

**15.** These cases also illustrate the reality that few creditors come into bankruptcy court and brag about their violations of either the automatic stay or the discharge. Instead, creditors attempt to minimize the importance of their actions, downplay the "willfulness" of their conduct, and discount the reality of any harm to the debtors. Rare indeed is the creditor who claims to have brazenly disregarded a bankruptcy notice; far more common are those who suggest that the notice was mis-

placed, misfiled, or misdirected. Under the standards set forth in *Hardy*, such conduct may still result in a "willful" violation of the discharge, and appropriately so. Given that the discharge is the "cornerstone" of the bankruptcy system and is a "critical feature" of virtually every individual bankruptcy, *see Katz*, 126 S.Ct. at 996, creditors must be held accountable for their lack of care and negligence in these instances. *Faust*, 270 B.R. at 315–16.

ed. First of all, the debtor worked as a truck driver. While he was reassigned by his employer to other duties, there do appear to be some lost wages associated with this reassignment. Further, the debtor clearly feared the loss of his job as a result of the suspension. And finally, in contemporary America the lack of a vehicle, or the sudden inability to drive one, is crippling in many ways often taken for granted. The testimony of Allen B. Fleming, Ph.D., the psychologist engaged to examine the debtor, indicates that the lengthy struggle with State Farm affected and depressed him in a number of ways.

■ As the months dragged on, the license suspension was undoubtedly frustrating and emotionally draining on the debtor and his family, especially since he made attempts to settle the matter with State Farm only to be unceremoniously rebuffed. Some courts question whether damages for emotional distress can be awarded in the context of a discharge violation. See Bock, 297 B.R. at 29. However, other courts have found that a discharge violation can result in such damages. See In re Feldmeier, 335 B.R. 807 (Bankr.D.Or.2005); United States v. Rivera Torres (In re Rivera Torres), 309 B.R. 643 (1st Cir. BAP 2004); Poole v. U.B. Vehicle Leasing, Inc. (In re Poole), 242 B.R. 104 (Bankr. N.D.Ga.1999). In Feldmeier, the court noted that the legislative history of the discharge injunction recognizes "that the injunction is intended to protect more than financial interests." 335 B.R. at 813. Indeed, § 524 is intended to prohibit not just legal action but telephone calls, letters, and all personal contacts; as such, "the contempt remedy, which provides for an award of 'compensatory damages,' should include compensation for emotional distress suffered by a debtor as a result of a creditor's willful violation of the discharge injunction." Id. at 814.

State Farm argues that since it was not aware of Shenkman's dealings with the debtor after the license suspension, the extended delay in reinstating the license should not be considered as a component of the damage calculation. However, the complaint in this adversary proceeding was served directly on State Farm on June 27, 2005, just a little over a month after the debtor initially contacted Shenkman about the suspension. Notwithstanding this fact, the debtor's license was not reinstated until the end of September. State Farm had notice of the issue and again chose to ignore it; the company left Shenkman on his own, and only belatedly appeared after a default was entered for failure to file an answer. State Farm's culpability for the debtor's situation is clear.

In order to give full effect to the bankruptcy discharge, creditors who willfully violate the injunction must face the consequences of their actions. Like many creditors, State Farm has sought to minimize the effect of its behavior throughout this case, including its negligent and cavalier attitude once it received actual notice of the bankruptcy and its failure to timely answer the adversary complaint even when directly served. It seeks to place the blame for its conduct upon the debtor, or upon the attorney it hired to prosecute its subrogation claims. Ultimately, however, had State Farm exercised even minimal effort after learning of the debtor's bankruptcy, there would have been no violation of the debtor's discharge. Accordingly, based upon the record, the Court concludes that it is appropriate to issue an award of actual damages for lost wages, emotional distress, and the attendant discomfort and costs associated with the loss of his driver's license, all of which were the

direct result of State Farm's willful violation of the discharge injunction in this case. The Court also finds it appropriate to issue an award of reasonable attorney's fees associated with the prosecution of this adversary proceeding. Pursuant to the Court's authority under 11 U.S.C. § 105(a), the debtor is hereby awarded $1,100.00 in lost wages, $6,250.00 for emotional distress, $50,250.00 in attorney's fees, and $9,029.66 in costs, for a total of $66,629.66.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.