**In re David RICHIE, Debtor.**

**Bruce Loud and Sharron Loud, Plaintiffs,**

v.

**David Richie, Defendant.**

**Bankruptcy No. 8:99–bk–15035–PMG. Adversary No. 8:06–ap–452–PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 17, 2007.

See also 2007 WL 4699053.

1. "(3) 'includes' and 'including' are not limiting;" 11 U.S.C. § 102(3).

Larry M. Foyle, Kass Shuler Solomon Spector Foyle et al., Tampa, FL, for Plaintiffs.

David Richie, pro se.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing to consider the Complaint to Determine Dischargeability under Section 523(a)(3) filed by the Plaintiffs, Bruce Loud and Sharron Loud.

On January 12, 2001, the Circuit Court for Wayne County, Michigan entered a Default Judgment in favor of the Plaintiffs and against the Debtor, David Richie, in the amount of $47,487.00. The Plaintiffs subsequently filed this action seeking a determination that the judgment debt is nondischargeable pursuant to § 523(a)(3)(B) of the Bankruptcy Code. Section 523(a)(3)(B) provides:

**11 U.S.C. § 523. Exceptions to discharge**

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . .
>
> (3) neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—
>
> . . .
>
> (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.

11 U.S.C. § 523(a)(3)(B).

"[S]ection 523(a)(3)(B) preserves for certain omitted creditors the right to litigate the dischargeability of a debt under § 523(a)(2), (4), or (6) after the expiration of the period within which scheduled creditors must file complaints.... However, § 523(a)(3)(B) does not reduce the burden of proof required to establish that a debt is of a kind that would be excepted from discharge under § 523(a)(2), (4), of (6)." *In re Cameron*, 305 B.R. 94, 97 (Bankr.M.D.Fla.2003). "In a section 523(a)(3)(B) action, the plaintiff must prove all the elements of nondischargeability under section 523(a)(2), (a)(4), or (a)(6) and, in addition, must prove that the debt was unscheduled, unlisted, and the plaintiff was unaware of the bankruptcy in time to comply with the section 523(c) sixty-day deadline." *In re Franklin*, 179 B.R. 913, 924 (Bankr.E.D.Cal.1995)(quoted in *In re Cameron*, 305 B.R. 94, 97 n. 2 (Bankr. M.D.Fla.2003)).

In this case, it is undisputed that the Debtor filed a petition under Chapter 7 of the Bankruptcy Code on September 16, 1999, and that the Plaintiffs were not listed on the Debtor's schedules in time to permit them to file a dischargeability action by the deadline established in Rule 4007 of the Federal Rules of Bankruptcy Procedure.

The issue in this case, therefore, is whether the judgment debt owed to the Plaintiffs is "of a kind specified in paragraph (2), (4), or (6)" of § 523(a).

This Court has determined that the Plaintiffs must establish their cause of action under § 523(a)(2), (4), or (6) by a preponderance of the evidence. (Doc. 9, Order on Defendant's Motion for Summary Judgment, p. 6). Section 523(a)(3)(B) "does not reduce the burden

of proof required to establish that a debt is of a kind that would be excepted from discharge under § 523(a)(2), (4), or (6)." *In re Cameron*, 305 B.R. at 97. See *In re Jones*, 296 B.R. 447, 450 (Bankr.M.D.Tenn. 2003)(A creditor must prove the merits of its cause of action under § 523(a)(2), (4), or (6) for a debt to be nondischargeable under § 523(a)(3)(B).).

The Plaintiffs' claim against the Debtor is an action for fraud under § 523(a)(2)(A) of the Bankruptcy Code. Section 523(a)(2)(A) provides that a discharge under § 727 does not discharge an individual debtor from any debt based on "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

■ To establish fraud under § 523(a)(2)(A), a creditor must prove that "(1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the false representation." *In re Wood*, 245 Fed.Appx. 916, 917–18 (11th Cir.2007). See also *Lightner v. Lohn*, 274 B.R. 545, 549 (M.D.Fla.2002).

A final evidentiary hearing was conducted in this case to determine whether the debt owed by the Debtor to the Plaintiffs is a nondischargeable debt under § 523(a)(2)(A). The debt arose from the Debtor's sale of a home to the Plaintiffs in February of 1996.

### The Evidence

The Debtor and his former wife owned and lived in a home located at 4482 Harvard Road, Detroit, Michigan, from approximately 1978 to 1995. (Transcript, p. 37). The home had been built in 1927. (Plaintiffs' Exhibit 4).

The home was originally constructed with a raised front porch. The porch was built with a concrete slab floor, and brick veneer on the front and sides.

In approximately 1990, the Debtor built a wood deck around the existing porch. The deck included wood flooring, wood side panels or skirting around the brick, and wood steps to replace to the former concrete steps. (Transcript, p. 162; Plaintiffs' Exhibit 8, p. 47). In connection with the construction of the deck, the Debtor removed the existing concrete steps, and also removed three columns that had been attached to the porch railing. (Transcript, pp. 50, 59, 61, 162; Plaintiffs' Exhibit 8, pp. 48, 50–51, 57).

In 1995, the Debtor's marriage ended, and the Debtor and his wife listed the home for sale. The Debtor engaged Ann Porter as the sellers' real estate agent, and Porter conducted at least one "walkthrough" examination of the home. (Plaintiffs' Exhibit 8, pp. 26, 76–77).

The Debtor signed a Seller's Disclosure Statement on May 16, 1995. (Plaintiffs' Exhibit 3). In the Disclosure Statement, the Debtor indicated (1) that there was no evidence of water in the basement, (2) that the roof did not leak, (3) that no structural modifications or repairs had been made "without necessary permits or licensed contractors," and (4) that any "settling, flooding, drainage, structural or grading problems" were "unknown." A second Disclosure Statement was subsequently signed by both the Debtor and his former wife. The information contained in the second Disclosure Statement is virtually identical to the information on the first document.

On June 14, 1995, the Debtor obtained an Inspection Report from the City of Detroit Housing Inspection Division. (Debtor's Exhibits 2, 3). The only deficiencies noted in the Report, as it appears

in the record, relate to certain minor electrical and plumbing problems.

On June 21, 1995, an additional inspection of the home was conducted at the request of prospective buyers who were considering a government loan to purchase the property. (Plaintiffs' Exhibit 8, pp. 72–74.) A written Report was generated as a result of the inspection. (Composite Exhibit D to Plaintiffs' Exhibit 9).

The Debtor obtained a Permit for certain electrical work on June 29, 1995, shortly after the two inspections were conducted. (Plaintiffs' Exhibit 5). The Debtor testified that he corrected all of the deficiencies noted in both inspections. (Transcript, pp. 182–83; Plaintiffs' Exhibit 8, p. 73). Further, the Debtor testified that he re-painted the basement after the second inspection was performed, pursuant to the suggestion of the inspector. (Plaintiffs' Exhibit 8, pp. 23, 79).

The Plaintiffs became interested in purchasing the home in November of 1995. (Transcript, p. 111). They personally visited the home "a couple times." (Transcript, p. 112).

On January 12, 1996, a Uniform Residential Appraisal Report was issued with respect to the home. (Debtor's Exhibit 6). The Appraisal Report identifies the Plaintiffs as the borrowers, and states that the appraiser made a physical inspection of the home. The Report does not identify any structural deficiencies, and concludes that the market value of the property was $79,000.00 as of January 12, 1996.

On January 16, 1996, Home Team Inspection Service conducted an inspection of the property. The Plaintiffs had engaged Home Team to perform the inspection. According to the Report prepared by Home Team, there were "no major visual defects observed" in the visible portions of the foundation, the roof, the garage, or the electrical system. The Report also indicated that the basement was "dry at the time of the inspection," and that no major visual defects were observed, but that "because the basement is below the grade of the land, there exists a certain vulnerability to moisture penetration after heavy rains." (Plaintiffs' Exhibit 6).

The Plaintiffs elected to purchase the home, and apparently entered into a Purchase Agreement with the Debtor and his former wife. The Purchase Agreement is not in the record. On the same date that Home Team performed the inspection, however, the Plaintiffs signed a document entitled "Contractor's Inspection Removal," in which they stated that they were not satisfied with the results of the inspection. (Composite Exhibit D to Plaintiffs' Exhibit 9). In the document, the Plaintiffs listed the items that were not satisfactory to them, and stated that they would "accept a credit at the closing of $2,500.00 from the sellers toward the cost of the above mentioned repairs."

The closing was conducted on February 2, 1996. (Plaintiffs' Exhibit 7). The purchase price was $78,000.00. It is not clear whether the stated purchase price includes the $2,500.00 credit stipulated by the Plaintiffs.

The Plaintiffs and the Debtor attended the closing. It is undisputed that the Plaintiffs and the Debtor had never met before the closing, and that the conversation that they had on that day was the only direct discussion that ever occurred between the parties regarding the home. (Transcript, pp. 55, 112).

It is also undisputed that, during the closing, the Plaintiffs asked the Debtor about the condition of the front porch beneath the wood deck. According to the Debtor, he responded that the porch was in "good shape," and that the only problem had been with the steps. (Transcript, pp.

51, 55; Plaintiffs' Exhibit 8, p. 63). According to the Plaintiffs, the Debtor told them that the original porch was "totally" under the wooden deck, and that the only replaced components were the concrete steps. (Transcript, p. 122).

The sale closed, and the Plaintiffs took possession of the property.

In the spring of 1996, within a few months after the purchase, Mrs. Loud testified that the basement experienced serious water intrusion. She testified, for example, that the water was "literally running across the floor to the drain from a wall." (Transcript, p. 133). Further, according to Mrs. Loud, the material covering the basement walls began to flake and crumble approximately one month after the spring rains began. (Transcript, pp. 135–36, 153).

Finally, Mrs. Loud testified that the Plaintiffs removed the wood skirting from the deck in the summer of 1996, and discovered that the "original porch was not all there." (Transcript, p. 125). She also testified that the vestibule area around the porch is sinking and falling from the house. (Transcript, p. 127). The Plaintiffs contend that they obtained an estimate in 1996, and that the cost to "restore the front porch to original condition" is approximately $15,730.00. (Plaintiffs' Exhibit 10).

Based on these circumstances, the Plaintiffs contend that the Debtor "was aware that the property had specific defects," and that he took steps to conceal the defects from the Plaintiffs prior to their purchase of the home. According to the Plaintiffs, the Debtor's acts of concealment, as well as his written statements in the Disclosure Statement and his verbal statements at closing, constitute intentional misrepresentations regarding the condition of the property. Consequently, the Plaintiffs seek a determination that the Debtor's liability to them is nondischargeable in his Chapter 7 case. (Doc. 1).

## Burden of Proof

As set forth above, to establish fraud under § 523(a)(2)(A) of the Bankruptcy Code, a creditor must prove that the debtor made a false representation with the intention of deceiving the creditor, that the creditor justifiably relied on the false representation, and that the creditor sustained a loss as a result of the false representation. *In re Wood,* 245 Fed.Appx. at 917–18.

■ The Plaintiffs bear the burden of proving all of the elements of their cause of action by a preponderance of the evidence. *In re Macdonald,* 2007 WL 2688515, at \*3 (Bankr.S.D.Fla.); *In re Daprizio,* 365 B.R. 268, 279 (Bankr.S.D.Fla. 2007).

■ Further, Courts generally construe objections to dischargeability strictly against the creditor and liberally in favor of the debtor. *In re Daprizio,* 365 B.R. at 279.

## Application

■ In this case, the Plaintiffs assert that the Debtor made false representations regarding the condition of the home by virtue of his responses on the Seller's Disclosure Statement, his verbal response at closing that the original porch was in good shape, and his cosmetic improvements to the home prior to showing it to the Plaintiffs. (Transcript, pp. 267–69).

The Plaintiffs also assert that the Debtor's misrepresentations relate primarily to (1) the condition of the front porch, (2) certain structural damage to the basement walls, (3) significant leaks or water intrusion in the basement, and (4) the Debtor's failure to obtain permits for repairs or

modifications performed on the home. (Transcript, p. 276).

The Court has considered each of the alleged misrepresentations, and finds that the Plaintiffs failed to prove by a preponderance of the evidence that the Debtor made any misrepresentation regarding the condition of the home with the intent to deceive the Plaintiffs.

### A. The porch

It is clear that the original porch beneath the wood decking is currently in a state of deterioration. Kirk Nelson (Nelson), a licensed residential builder in Michigan, visited the property in May and August of 2007, and examined the porch. (Plaintiffs' Exhibit 9, p. 47). According to Nelson, he found that the brick veneer lacked support and was falling away, and that the vestibule floor was sinking. (Plaintiffs' Exhibit 9, pp. 36–37). He also found that "much of the brick and the things that would have made up that porch" were not there. (Plaintiffs' Exhibit 9, p. 38).

Additionally, it appears that the original porch beneath the decking was in a state of disrepair as of the summer of 1996, shortly after the Plaintiffs purchased the home. Mrs. Loud testified that the Plaintiffs removed a portion of the wood skirting at that time, and found that the porch "was not all there." (Transcript, p. 125). The Plaintiffs presented photographs that were taken in the summer of 1996, and the photographs appear to show that the brick veneer was damaged and cracked at that time. (Plaintiffs' Exhibit A; Transcript, p. 121).

The Debtor, on the other hand, consistently testified that he was not aware of any structural damage that existed with respect to the porch when the wood deck was built in 1990, and that he did not cause any damage to the remaining brick when he removed the columns. (Plaintiffs' Exhibit 8, pp. 47, 50–51). Significantly, the Debtor testified that there were no holes or cracks in the brick veneer when he constructed the deck around it. (Plaintiffs' Exhibit 8, pp. 54, 56). Finally, the Debtor also testified that he believed the original porch to be in sound condition when he sold the home to the Plaintiffs in 1996. (Transcript, pp. 51–53, 203).

The Plaintiffs have not shown by a preponderance of the evidence that the Debtor knew that the porch was damaged when he sold the home, and that he intentionally misrepresented the condition of the porch to the Plaintiffs.

The Plaintiffs assert that the Debtor must have known of the damage at the time of the sale, because certain repairs had been undertaken prior to the time that the deck was built. Nelson testified, for example, that an area of the wall near the driveway had been repaired, and that the front of the home had been "tuckpointed," prior to the construction of the deck. (Plaintiffs' Exhibit 9, p. 53). The evidence of prior repairs is the primary evidence presented by the Plaintiffs to show that the Debtor was aware of the damage to the porch when he sold the home in 1996.

No evidence was presented, however, as to when the repairs were made, whether the Debtor was responsible for making all of the repairs, or the circumstances surrounding the repairs. Further, the Debtor testified that "tuckpointing" is a matter of normal or routine maintenance, especially in northern climates. (Transcript, p. 241).

Additionally, it appears that the Plaintiffs were given liberal access to the home prior to the sale, and that they had an adequate opportunity to investigate the condition of the porch. The Plaintiffs personally visited the home at least twice, and an appraiser and a home inspector also

physically viewed the home on their behalf. The Debtor testified that he granted permission to the Plaintiffs to remove a floor board from the deck, or "any planks that they wanted," so that they could better inspect the underlying porch. (Plaintiffs' Exhibit 8, pp. 60–61).

In other words, the Plaintiffs have not shown that the Debtor concealed the condition of the original porch prior to the sale. Further, the Plaintiffs did not show that the Debtor knew of the porch's deterioration when he told them at closing that it was in good condition. The Debtor presented uncontroverted testimony that the porch was not compromised when he built the deck in 1990, and there is no clear evidence in the record that the Debtor ever removed the wood panels and viewed the existing porch after the deck was constructed.

The Plaintiffs did not prove by a preponderance of the evidence that the Debtor made any false representations regarding the condition of the porch "with the intention of deceiving" them.

### B. The walls

On September 11, 1996, the Plaintiffs obtained an estimate from Calculus Construction to install twenty-one tie-backs and two piers to stabilize the vertical or horizontal movement of the walls in the home. (Plaintiffs' Exhibit 10). According to Mrs. Loud, Calculus had determined that the basement walls were bowed in. (Transcript, pp. 151–52). The estimated cost to install the tie-backs was $18,150.00. (Plaintiffs' Exhibit 10).

The Debtor contends that the basement walls are not damaged, and that tie-backs are not necessary to stabilize the structure. (Transcript, pp. 151–53). Kirk Nelson, the licensed builder, testified that horizontal cracks in the walls of an unfinished basement would be detected by an inspec-

tor if the walls were bowed so severely that tie-backs were necessary. (Plaintiffs' Exhibit 9, pp. 74–75). No such cracks or other signs of damage were reported either by the City inspector, the residential appraiser, or the Home Team inspector.

No explanation, sworn statement, or backup documentation appears in the record to substantiate Calculus' conclusion that the walls were damaged. The only evidence presented by the Plaintiffs to support this component of their claim is Calculus' estimate of how much it would cost to install the tie-backs.

Further, the Debtor asserts that he did not re-paint the basement walls for the purpose of concealing any cracks or damage. On the contrary, the Debtor testified that he thought the walls looked good when he listed the home for sale, and that he had no plans to re-paint them. (Plaintiffs' Exhibit 8, p. 74). The inspector for the prior prospective purchaser believed that the back basement wall was stained, however, and suggested that the Debtor paint the basement walls. Consequently, according to the Debtor, "she said paint it," so he "had it painted." (Plaintiffs' Exhibit 8, pp. 73–74, 79).

The Plaintiffs did not establish that the Debtor knew that the basement walls were damaged, or that the Debtor intentionally misrepresented their condition before the sale. In other words, the Plaintiffs did not prove by a preponderance of the evidence that the Debtor made any false representations regarding the condition of the basement walls with the intention of deceiving them.

### C. Water intrusion

Mrs. Loud testified that the basement experienced serious water intrusion within months after the Plaintiffs purchased the home. She testified, for example, that

there was "water literally running across the floor to the drain from a wall" in the spring of 1996. (Transcript, p. 133). She also testified that the coating on the walls later started flaking and crumbling, and that mold appeared in the basement. (Transcript, pp. 135–36).

Kirk Nelson, the licensed builder, corroborated Mrs. Loud's testimony regarding the water intrusion that occurred after the Plaintiffs purchased the home. Nelson stated that he observed evidence of water intrusion in the basement in the form of stains on the walls, and parging that was falling off of the blocks. (Plaintiffs' Exhibit 9, p. 54). Nelson also testified that the water intrusion resulted from groundwater or rainwater, rather than water entering the basement from "above grade." (Plaintiffs' Exhibit 9, p. 56). As indicated above, Nelson viewed the home in May and August of 2007.

The Debtor contends that he never saw groundwater enter the basement in the years that he owned the home. (Plaintiffs' Exhibit 8, pp. 30–31). "I did not have water intrusion in the house." (Transcript, p. 89). He further testified that he never noticed any stains or discoloration that might have resulted from the entry of groundwater into the basement. (Plaintiffs' Exhibit 8, pp. 29, 33).

Similarly, the Home Team inspection report, prepared at the Plaintiffs' request, states that the basement was dry at the time of the inspection. (Plaintiffs Exhibit 6, p. 4). It is acknowledged that the Home Team inspection occurred in January, and that water intrusion is unlikely to occur in the winter months. The report also states, however, that there were "no major visual defects observed in the basement," and that because "the basement is below the grade of the land, there exists a certain vulnerability to moisture penetration after heavy rains." A copy of the inspection

report was delivered to the Plaintiffs on January 17, 1996, prior to closing. (Plaintiffs' Exhibit 6).

Additionally, the Uniform Residential Appraisal Report dated January 12, 1996, notes that no dampness was observed in the foundation of the home. (Debtor's Exhibit 6).

After considering all of the evidence, the Court finds that the Plaintiffs did not establish that the Debtor was aware of any water intrusion into the basement before the sale of the home. The inspection reports did not note any evidence of such intrusion, and the Debtor asserts that he did not experience any water in the basement while he owned the home. Although Nelson observed evidence of such water intrusion, his view of the home occurred in 2007, approximately eleven years after the sale. Under these circumstances, the Plaintiffs did not prove by a preponderance of the evidence that the Debtor made any false representations regarding water intrusion into the basement with the intention of deceiving them.

### D. Permits

The records of the City of Detroit License and Permits Department reflect that two permits were obtained when the home was originally constructed in 1927. No additional permits appear in the City's records for the home before 1995. (Plaintiffs' Exhibit 4).

While the Debtor owned the home, of course, he constructed the wood deck around the porch, and also built a garage on the same site where a previous garage had stood. No permits appear in the public records relating to the improvements.

The Debtor testified that he hired his brother-in-law, a licensed contractor, to assist him with the construction of the deck and the garage. He also hired a separate

contractor to pour the cement pad for the garage. The Debtor acknowledges that he did not personally obtain any permits for the projects. He testified, however, that he relied on the contractors to obtain the necessary permits. "On something like that, I would have let my brother-in-law do that." (Transcript, pp. 69–71).

The Debtor appeared to believe even as of the date of the trial that his brother-in-law, the licensed contractor, had obtained all of the appropriate permits for the construction work on the house. (Transcript, p. 73).

The Seller's Disclosure Statement that the Debtor signed in May of 1995 asks whether any structural modifications or repairs were made to the home "without necessary permits *or licensed contractors.*" The Debtor answered "no." (Plaintiffs' Exhibit 3)(Emphasis supplied).

The Plaintiffs have not proven by a preponderance of the evidence that the Debtor made any false representations regarding the permit history for the home with the intention of deceiving them.

### Conclusion

■ To prevail in a dischargeability action under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that the debtor made a false representation with the intention of deceiving the creditor. *In re Wood,* 245 Fed.Appx. at 917–18. The Plaintiffs have not satisfied their burden in this case.

The action relates to the Debtor's sale of a home to the Plaintiffs in 1996.

The Plaintiffs presented evidence showing that the original porch on the home has deteriorated, that tie-backs should be installed to stabilize the basement walls, that groundwater has intruded into the basement, and that permits were not obtained for all of the contracting jobs completed on the property. For purposes of the current action, however, it is not sufficient to show that the conditions exist. The Plaintiffs must show that the Debtor was aware of the conditions at the time of the sale, and that he misrepresented or actively concealed them with the intent to deceive the Plaintiffs. *Huhtasaari v. Stockemer,* 2005 WL 3481429, at *8 (Mich. App.)("The mere fact that water incursion was evident on opening the interior walls does not demonstrate that the Stockemers knew of the condition and failed to disclose it. . . . ").

According to the Plaintiffs, the Debtor's misrepresentations consist of his responses on the Seller's Disclosure Statement, his verbal response at closing that the original porch was in good shape, and his cosmetic improvements to the home prior to showing it to the Plaintiffs. (Transcript, pp. 267–69).

According to the Debtor, he never intentionally misrepresented the condition of the home to the Plaintiffs. The Debtor testified that he believed the original porch to be in sound condition when he built the deck around it, and when he sold the home to the Plaintiffs. The Debtor also testified that he had not seen any signs of water intrusion or damage to the basement walls while he lived in the home, and that he did not re-paint the basement walls to conceal any such damage. Finally, the Debtor testified that he worked with a licensed contractor to construct the deck and the garage, and that he relied on the contractor to obtain all necessary permits for the projects.

The Plaintiffs did not controvert the Debtor's testimony by showing that the Debtor in fact knew of the conditions at issue when he sold the home. The home was almost seventy years old when the Plaintiffs purchased it. Repairs had been performed on the home before the sale, and repairs were needed to restore or maintain the home after the sale. The

performance of such repairs, however, is not sufficient to show that the Debtor was aware of the specific conditions described by the Plaintiffs, and that the Debtor fraudulently concealed the conditions before the sale.

The Plaintiffs did not establish that the debt is nondischargeable under § 523(a)(2)(A). The debt owed by the Debtor to the Plaintiffs is not excepted from the Debtor's discharge pursuant to § 523(a)(3)(B) of the Bankruptcy Code.

Accordingly:

**IT IS ORDERED** that:

1. The debt owed by the Debtor, David Richie, to the Plaintiffs, Bruce Loud and Sharron Loud, is not excepted from the Debtor's discharge pursuant to § 523(a)(3)(B) of the Bankruptcy Code, and is therefore dischargeable in the Debtor's Chapter 7 case.

2. A separate Final Judgment will be entered in favor of the Debtor, David Richie, and against the Plaintiffs, Bruce Loud and Sharron Loud, in this adversary proceeding.