In re Christina PAYLAN, Debtor.

**Regents of the University of California, Plaintiff,**

v.

**Christina Paylan, Defendant.**

Bankruptcy No. 8:02–bk–19238–PMG.
Adversary No. 8:03–ap–544–PMG.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Feb. 8, 2008.

Dawn A. Carapella, Lindsay M. Patrick, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL, for Plaintiff.

Alberto F. Gomez, Jr., Morse & Gomez, P.A., Tampa, FL, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION ON THE BAITCHER ISSUE

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing on the Baitcher issue.

The Plaintiff, Regents of the University of California, commenced this adversary proceeding by filing a Complaint to Determine Nondischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(3).

In the Complaint, the Plaintiff alleges that it is a creditor of the Debtor, Christina Paylan, by virtue of a judgment in the amount of $1,149,858.02. The Plaintiff asserts that the judgment debt is nondischargeable in the Debtor's bankruptcy case under § 523(a)(3) of the Bankruptcy Code, because it is a debt for willful and malicious injury within the meaning of § 523(a)(6), and because it was not listed on the Debtor's schedules in time for the Plaintiff to file a timely request for a determination of nondischargeability under § 523(a)(6).

After the filing of the Complaint, the Court entered an Order on Defendant's Motion to Bifurcate and Set Baitcher Issue for a Final Evidentiary Hearing. (Doc. 63). In accordance with the Order, the following issues were scheduled for final evidentiary hearing:

1. Whether the failure to schedule the debt owed by Christina Paylan to the Regents of the University of California was due to fraud or intentional design on the part of Christina Paylan?

2. Whether the Regents had actual notice of Christina Paylan's bankruptcy case in time to timely file a non-dischargeability action pursuant to 11 U.S.C. § 523(a)(6)?

The evidentiary hearing on the two issues was conducted on March 30, 2007, May 22, 2007, December 4, 2007, and December 5, 2007. Based on the evidence presented at the hearing, the Court enters these Findings of Fact and Conclusions of Law.

### Background

The Debtor is a licensed cosmetic surgeon. (Transcript, pp. II–56, III–15).

In 1994, the Debtor graduated from medical school and entered a residency program at the University of California, Irvine. (Transcript, pp. II–57–58, III–16).

On December 8, 1995, the Debtor commenced an action against the University of California and other defendants in the state court in California (the State Court Action). The State Court Action included claims based on sexual harassment, retaliation, and wrongful termination. (Joint Exhibit 1B). E. Joseph Connaughton (Connaughton) was an attorney for the University of California in the State Court Action.

On June 11, 1998, a judgment was entered in the State Court Action against the Debtor and in favor of the University of California.

On October 9, 1998, a Final Order Entering Costs was entered against the Debtor in the State Court Action. Pursuant to the Final Order, the University of California was awarded the total sum of $1,149,858.02 as the fees and costs that it had incurred in defending the action. (Joint Exhibit 1).

On February 14, 2002, the Court of Appeal of the State of California entered an Opinion affirming the decisions of the trial court. (Joint Exhibit 1B).

In the summer of 2002, the Debtor met with an attorney, H. Jeff Miller (Miller), regarding the filing of a bankruptcy case in Florida. (Transcript, p. II–90–91). The Debtor had moved to Florida to accept a fellowship at Tampa General Hospital. (Transcript, p. II–88).

On July 28, 2002, the Debtor sent Miller a bankruptcy worksheet that she had attempted to complete in anticipation of the bankruptcy filing. (Joint Exhibit 6). In the worksheet, the Debtor listed the California action as a suit to which she was a party, and listed Connaughton as a "collec-tion agency" for the University of California. In the cover letter to Miller, she wrote that her "biggest fear" was that "the California attorneys will hire some investigator to snoop around Tampa General, spreading information that they have a 1.1 million dollar judgment against me."

On September 30, 2002, the Debtor filed a petition under Chapter 7 of the Bankruptcy Code. The Schedules filed with the Petition were incomplete. No Schedule D was filed, and no creditors were listed on Schedules E or F.

On October 3, 2002, the Court issued its Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines. Pursuant to the Notice, the deadline to file a complaint to determine the dischargeability of a debt was December 30, 2002. The Notice was served on the Debtor, Miller, the Chapter 7 Trustee, and the United States Trustee. The Notice was not served on any creditors. (Main Case, Doc. 3).

On October 3, 2002, the Debtor wrote a letter to Fred Takemiya (Takemiya), an attorney with the University of California's Office of General Counsel. (Joint Exhibit 8). In the last paragraph of the letter, the Debtor wrote:

> I would ask that in light of the recently filed bankruptcy, you would give strict instructions to Mr. Connaughton not to contact my current and/or immediate past employer until the bankruptcy proceedings are finalized.

The Debtor testified that she faxed the letter to Takemiya on October 3, and that she also mailed the letter to him. (Transcript, pp. II–111–112, III–48). Takemiya testified, however, that he never received the Debtor's letter, either by mail or by facsimile. (Transcript, pp. II–28, II–30, II–33, II–256). Takemiya also testified that he had searched the University's rec-

ords for the letter, and that the letter was not in the University's files. (Transcript, pp. II–258, II–261).

On December 5, 2002, the Debtor filed Amended Schedules and an Amended Statement of Financial Affairs. (Main Case, Doc. 7A). On her Amended Schedule F, the Debtor listed "E. Joseph Conninghton," at Connaughton's address, as a creditor holding an unsecured claim in the amount of $1,100,000.00. The basis for the debt was "costs of litigation." She also listed the California State Court Action on her Amended Statement of Financial Affairs.

On December 20, 2002, the Court entered an Order Striking Amendment. (Main Case, Doc. 9). In the Order, the Court found that the Amended Schedules were deficient because the Amendment did not contain an appropriate proof of service, and because a copy of the Notice of Bankruptcy Case was not served on the additional creditors, among other deficiencies.

On January 23, 2003, Amended Schedules and an Amended Statement of Financial Affairs were again filed in the Bankruptcy Court. (Main Case, Doc. 11). "E. Joseph Conninghton" was again listed as a creditor holding an unsecured claim in the amount of $1,100,000.00, and the California State Court Action was again listed as a suit to which the Debtor was a party. The Debtor contends that she did not sign the Amended Schedules and papers filed on January 23, 2003. (Transcript, pp. II–161, III–69).

On February 3, 2003, Connaughton wrote a letter to Miller, the Debtor's attorney, in which he stated that he had learned of the Debtor's bankruptcy petition. (Joint Exhibit 18). According to Connaughton, he first learned of the bankruptcy case on January 27, 2003, when he received a telephone call from an attorney for the Medical College of Ohio, which had

also been involved in litigation with the Debtor. (Transcript, pp. IV–29–32, IV–97).

In any event, in the letter to Miller, Connaughton stated that, "despite being listed on the service list, I received no notice of [the Debtor's] petition whatsoever." In a subsequent letter to Miller dated February 26, 2003, Connaughton again stated that he had not been served, or received any notice of, the Debtor's bankruptcy petition. (Joint Exhibit 20).

The Debtor received her discharge on August 7, 2003, and the Chapter 7 case was closed on the same date. Shortly thereafter, the Regents of the University of California reopened the case, and filed the Complaint that commenced this adversary proceeding.

### Discussion

In the Complaint, the Regents of the University of California (the Plaintiff) alleges that it is a creditor of the Debtor by virtue of the Final Order Entering Costs that was entered in its favor by the State Court in California. The Plaintiff asserts that the judgment debt is nondischargeable in the Debtor's bankruptcy case under § 523(a)(3) of the Bankruptcy Code, because it is a debt for willful and malicious injury within the meaning of § 523(a)(6), and because it was not listed on the Debtor's schedules in time to file a timely complaint for determination of nondischargeability.

Specifically, the Plaintiff seeks a determination that the debt owed to it by the Debtor is nondischargeable under § 523(a)(3)(B) of the Bankruptcy Code. Section 523(a)(3)(B) provides:

**11 USC § 523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title

does not discharge an individual debtor from any debt—

. . .

(3) neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

. . .

 (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.

11 U.S.C. § 523(a)(3)(B). "[S]ection 523(a)(3)(B) preserves for certain omitted creditors the right to litigate the dischargeability of a debt under § 523(a)(2), (4), or (6) after the expiration of the period within which scheduled creditors must file complaints." *In re Richie*, 2007 WL 4644663, at *1 (Bankr.M.D.Fla.2007)(quoting *In re Cameron*, 305 B.R. 94, 97 (Bankr. M.D.Fla.2003)). "The primary purpose of this discharge exception is fairness to those creditors who, through no fault of their own, were somehow prejudiced by not having the opportunity to protect their rights and assert their interests." *In re Manzanares*, 345 B.R. 773, 782 (Bankr. S.D.Fla.2006).

Pursuant to § 523(a)(3)(B) and the decision of the Eleventh Circuit Court of Appeals in *Samuel v. Baitcher*, 781 F.2d 1529 (11th Cir.1986), the Debtor in this case filed a Motion to bifurcate the dischargeability proceeding that had been commenced by the Plaintiff, and asked that the Court schedule the "Baitcher issue" for an evidentiary hearing in advance of any other matters in the case. (Doc. 43).

The Court granted the Debtor's Motion, and scheduled the following two issues for evidentiary hearing: (1) whether the failure to schedule the debt owed by the Debtor to the Plaintiff was due to fraud or intentional design on the part of the Debtor; and (2) whether the Plaintiff had notice or actual knowledge of the Debtor's bankruptcy case in time to file a timely dischargeability action pursuant to § 523(a)(6) of the Bankruptcy Code. (Doc. 63).

 The "threshold inquiry" in this case, therefore, is "whether the creditor received notice or possessed 'actual knowledge' of the bankruptcy case." *In re Manzanares*, 345 B.R. at 783.

If the Plaintiff had notice or actual knowledge of the Debtor's bankruptcy case prior to the deadline for filing a dischargeability complaint, the Debtor is entitled to a determination that the debt is dischargeable, because the Plaintiffs Complaint was filed after the deadline had passed. *Id.* at 782–83; *In re Sam*, 94 B.R. 893, 895 (Bankr.W.D.La.1988) *aff'd* 894 F.2d 778 (5th Cir.1990).

 On the other hand, if the Plaintiff did not have notice or actual knowledge of the Debtor's bankruptcy case before the deadline for filing a dischargeability complaint, the Court must evaluate the reasons why the debt was neither listed nor scheduled on the Debtor's schedules in time to permit the filing of a complaint before that date. *In re Garza*, 138 B.R. 100 (Bankr.M.D.Fla.1992).

If the failure to list or schedule the debt on the Debtor's schedules was due to the Debtor's fraud or intentional design, the debt is nondischargeable under § 523(a)(3), regardless of whether the Plaintiff would have prevailed on its inde-

pendent claim under § 523(a)(6). *Samuel v. Baitcher*, 781 F.2d at 1535.

■ If the failure to list or schedule the debt was inadvertent, however, the Court must conduct further proceedings to determine whether the debt is ultimately nondischargeable under § 523(a)(6) of the Bankruptcy Code. *Id.*

### A. Notice or actual knowledge

■ A debtor bears the burden of proving that his creditors had notice or actual knowledge of the bankruptcy case in time to protect their rights. *In re Sepell*, 2007 WL 853842, at *5 (Bankr.S.D.Iowa 2007). The United States Supreme Court explained the rationale for placing the burden on the debtor as follows:

> [J]ustice and the purpose of the section justify the technical rule that if the debtor would avoid the effect of his omission of a creditor's name from his schedules he must prove the facts upon which he relies.

*Hill v. Smith*, 260 U.S. 592, 595, 43 S.Ct. 219, 67 L.Ed. 419 (1923)(quoted in *United States v. Bridges*, 894 F.2d 108, 111 (5th Cir.1990)). See also *In re Harbaugh*, 301 B.R. 317, 320–21 (8th Cir. BAP 2003) and *In re Sam*, 94 B.R. at 895("The debtor has the burden of proving such actual knowledge including information as to where and when the bankruptcy petition was filed.").

■ In this case, the Court finds that the Debtor did not satisfy her burden of proving that the Plaintiff had notice or actual knowledge of her bankruptcy case prior to the deadline for filing a dischargeability complaint.

First, the record is clear that the Plaintiff was not listed on the initial schedules filed with the Chapter 7 Petition on September 30, 2002. (Main Case, Doc. 1). No Schedule D (creditors holding secured claims) was filed, and the Debtor affirma-tively answered on Schedule E and Schedule F that she had no creditors holding unsecured priority claims or unsecured nonpriority claims. Further, although the Debtor signed a Verification of Creditor Matrix, no "matrix listing of creditors" appears in the record with the Petition and initial schedules.

Second, the record is also clear that the Plaintiff was not served with the Notice of Chapter 7 Bankruptcy Case that was issued by the Court on October 3, 2002. (Main Case, Doc. 3). The Certificate of Service attached to the Notice reflects that the only parties served with the Notice were the Debtor, Miller, the Chapter 7 Trustee, and the United States Trustee. The Plaintiff was not served with the Notice, of course, because the Debtor had not yet furnished the Court with the names and addresses of any of her creditors.

Third, the record does not show that the Plaintiff was served with the Notice of Chapter 7 Bankruptcy Case, or any other notice of the bankruptcy case, at the time that the Debtor filed her Amended Schedules on December 5, 2002. (Main Case, Doc. 7A), The Court acknowledges that the Debtor filed an Amended Schedule of Unsecured Creditors on that date, and that "E. Joseph Conninghton" was listed on the Amended Schedule as a creditor holding a claim in the amount of $1,100,000.00. It also appears that a creditor matrix was filed with the Amendments, and that "E. Joseph Conninghton" was included on the matrix at Connaughton's business address.

Miller, as the Debtor's attorney, testified that it was his practice to mail amended schedules to any creditors who were added or affected by the amendment. (Transcript, p. IV–170). Miller also testified that he remembered mailing the Amendments to the creditors listed on the matrix, although Miller did not provide

any proof of such service or establish that the mailing occurred on or about December 5, 2002, when the Amendment was filed. (Transcript, pp. IV–157–59).

No certificate of service or certificate of mailing was filed with the Clerk's office, and no documentation appears in the record to evidence that the Debtor notified the newly-listed creditors of her bankruptcy case in December of 2002. Further, Connaughton testified that he did not receive the Notice of Commencement or any other written notice of the Debtor's bankruptcy case in December of 2002. (Transcript, pp. IV–29–32, IV–97).

On December 20, 2002, the Court entered an Order Striking the Amended Schedules filed on December 5, 2002. (Main Case, Doc. 9). According to the Order, the Amended Schedules were stricken in part because (1) the Amendment "did not contain an appropriate proof of service," and (2) "a copy of the Notice of Bankruptcy Case, Meeting of Creditors and Deadlines (Section 341 Meeting Notice) was not served on the additional creditors."

The deadline for filing a complaint to determine the dischargeability of a debt, or to object to the Debtor's discharge, was December 30, 2002, ten days after the entry of the Order Striking Amended Schedules. The Court file does not contain any documentation reflecting that the Notice of Chapter 7 Bankruptcy Case, or any other notice of the bankruptcy, was served on the Debtor's creditors before the deadline.

The Debtor, however, contends that the Plaintiff had actual knowledge of her bankruptcy case by virtue of a letter addressed to Fred Takemiya dated October 3, 2002. (Joint Exhibit 8). According to the Debtor, she wrote the letter to Takemiya, an attorney with the Plaintiffs Office of General Counsel, and made the following request:

I would ask that in light of the recently filed bankruptcy, you would give strict instructions to Mr. Connaughton not to contact my current and/or immediate past employer until the bankruptcy proceedings are finalized.

(Joint Exhibit 8). The two-page letter does not identify the court in which the Debtor's bankruptcy case had been filed, or the case number that had been assigned to it. The Debtor testified, however, that she faxed the letter to Takemiya on October 3, 2002, and that she also mailed the letter to him on or around that date. (Transcript, pp. II–111–112, III–48).

The Court finds that the Debtor did not establish that the Plaintiff received notice or actual knowledge of her bankruptcy case by virtue of the October 3 letter.

As indicated above, the Debtor testified that she faxed and mailed the letter to Takemiya on October 3. Further, the Debtor's former husband testified that he edited the letter for her, and that he was in the couple's apartment with the Debtor when he heard the Debtor operate the fax machine in another room. (Transcript, pp. I–77–80). He did not personally observe the Debtor transmit the October 3 letter to Takemiya.

Takemiya testified that he never received the Debtor's letter, either by mail or by facsimile. (Transcript, pp. II–28, II–30, II–33, II–256). Takemiya further testified that he would have noted the letter had he received it, because he had spent so much time on the Debtor's lawsuit against the University, and because it had been a "highly unusual, even extraordinary case." (Transcript, p. II–254).

Takemiya also testified that he had searched the University's records for the letter, and that the letter was not in the

University's files. (Transcript, pp. II–258, 261). Takemiya's testimony in this regard is corroborated by the deposition testimony of Kathryn Van Buskirk, a principal legal analyst with the University of California's Office of General Counsel. Van Buskirk testified that she searched for the letter in response to a discovery request initiated by the Debtor in this bankruptcy case, and that she did not locate the letter in the University's files. (Joint Exhibit 49, p. 16).

Finally, a facsimile "transmission verification report" tendered by the Debtor admittedly reflects that three pages were transmitted to the University's fax number on October 3, 2002, the date of the Debtor's letter. The copy of the Debtor's October 3 letter that was admitted into evidence, however, does not contain a facsimile caption or legend indicating that it had ever been faxed. Consequently, the Court cannot conclude that the Debtor's letter was the document referred to in the "transmission verification report," and the "transmission verification report" cannot be viewed as evidence that the letter was transmitted to the Plaintiff on October 3, 2002.

Takemiya testified that he first learned of the Debtor's bankruptcy case upon receiving a letter from Connaughton dated February 3, 2003. (Joint Exhibit 18; Transcript, pp. II–22, II–268). Connaughton testified that he first learned of the bankruptcy case on January 27, 2003, when he received a telephone call from an attorney for the Medical College of Ohio, which had also been involved in litigation with the Debtor. Further, Connaughton expressly testified that he had received no notice of the bankruptcy case, written or otherwise, prior to the telephone call on January 27, 2003. (Transcript, pp. IV–29–32, IV–97).

In summary, the Plaintiff was not listed on the Debtor's initial schedules, and the Court's records do not reflect that the Plaintiff was served with notice of the Debtor's bankruptcy case prior to December 30, 2002, the deadline for filing dischargeability complaints in the case. Further, the Debtor did not establish that Plaintiff received her letter to Takemiya prior to December 30, 2002, and therefore did not establish that the Plaintiff had actual knowledge of her bankruptcy case before the deadline for filing complaints.

Under these circumstances, the Court finds that the Debtor did not satisfy her burden of proving that the Plaintiff had notice or actual knowledge of the bankruptcy case in time to file a timely complaint to determine the dischargeability of the debt owed to it.

### B. Fraud or intentional design

Since the Court has determined that the Debtor did not satisfy her burden of proving that the Plaintiff had notice or actual knowledge of the bankruptcy case in time to file a timely dischargeability complaint, the Court must next determine whether the Debtor's failure to list the Plaintiff as a creditor on her schedules was due to her fraud or intentional design.

According to the Eleventh Circuit Court of Appeals in *Baitcher*, a debt may be nondischargeable under § 523(a)(3) if the debtor's failure to schedule that debt was due to fraud, intentional design, or an improper motive. *Samuel v. Baitcher*, 781 F.2d at 1534(cited in *In re Raanan*, 181 B.R. 480, 483 (Bankr.C.D.Cal.1995)).

> [W]hile sections 523(a)(3)(A) and (B) merely seek to remedy various prejudices befalling unscheduled creditors, the *Baitcher* doctrine insures that no fraud shall be committed upon the Court, even in the absence of creditor prejudice. Thus, in mandating the non-

dischargeability of debts unscheduled by fraud or intentional design, *Baitcher* effectively poses a judicially created supplement to the rule of section 523(a)(3). *In re McDaniel,* 217 B.R. 348, 355–56 (Bankr.N.D.Ga.1998).

■■ "Intentional design is evidenced by a blatant disregard of a known duty," or by the debtor's knowledge of the omitted creditor and the creditor's prepetition claim. *In re Collis,* 223 B.R. 814, 815–16 (Bankr.M.D.Fla.1997)(citing *In re Godley,* 62 B.R. 258, 261 (Bankr.E.D.Va.1986) and *In re Martinez,* 112 B.R. 46 (Bankr. M.D.Ga.1990)).

■■ The debtor bears the burden of proving the absence of fraud or intentional design. *In re Springer,* 127 B.R. 702, 708 (Bankr.M.D.Fla.1991). See also *In re McDaniel,* 217 B.R. at 356.

■■ In this case, it is clear that the Plaintiff was not properly listed as a creditor on the Debtor's schedules prior to the deadline for filing dischargeability complaints, even though the Debtor was aware that a judgment had been entered against her in the California State Court Action. It also appears that the Debtor was aware of the significance of the State Court judgment, and that she had demonstrated an understanding of the rules of service in prior litigation with the Plaintiff. (Transcript, pp. II–261–62, III–32, IV–39).

Under the particular circumstances of this case, however, the Court finds that the Debtor satisfied her burden of proving that the failure to list the Plaintiff as a creditor on her schedules was not due to fraud or intentional design.

First, the Debtor consistently testified at trial that her primary purpose in seeking bankruptcy relief was to obtain a discharge of the judgment for attorney's fees and costs that had been entered against her in the State Court Action. (Tran-

script, pp. II–117, III–35). When asked whether she discussed the $1,100,000.00 judgment with her bankruptcy attorney, for example, the Debtor testified:

It is the only reason I went to Jeff Miller. There would have been no other reason for me to file a bankruptcy but for the $1.1 million judgment.

(Transcript, pp. II–97–98). According to the Debtor, the judgment was the focus of her initial meeting with Miller:

The most prominent thing and always the constant theme was the $1.1 million judgment. There was nothing technical about the bankruptcy that we discussed. Everything else was collateral.

(Transcript, p. II–138).

The Debtor's former husband, Wail Sarieh, also testified that he consulted with the Debtor in 2002 regarding her financial situation, and that he was a "major contributor" in her decision to file a bankruptcy case. (Transcript, p. I–85). According to Sarieh, the existence of the judgment was the "whole issue" in connection with the bankruptcy filing. (Transcript, p. I–86). Sarieh testified that the judgment was the Debtor's major indebtedness, and constituted the main reason why she filed the bankruptcy case. (Transcript, p. 1–92).

Second, the evidence establishes that the Debtor informed Miller, her bankruptcy attorney, that a substantial judgment had been entered against her in the California State Court Action. The Debtor contends that she provided Miller with a copy of the judgment at their initial meeting in the summer of 2002. (Transcript, p. II–92).

Miller testified that the Debtor never furnished him with a copy of the judgment, either prior to the filing of the original petition on September 30, 2002, or by the deadline for filing dischargeability complaints on December 30, 2002. (Tran-

script, pp. IV–127–29, IV–131–32, IV–155). (See also Joint Exhibit 22, 10/14/02 email from Miller to Debtor).

Miller acknowledges, however, that the Debtor told him at their initial meeting that a judgment had been entered against her. (Transcript, p. IV–127). Documentary evidence presented at trial also establishes that the Debtor informed Miller of the existence of the judgment for the purpose of listing the debt in her bankruptcy case. On July 28, 2002, for example, the Debtor returned her bankruptcy worksheet to Miller with a transmittal letter in which she stated:

My biggest fear right now is that the California attorneys will hire some investigator to snoop around Tampa General, spreading information that *they have a 1.1 million dollar judgment against me.*

(Joint Exhibit 6)(Emphasis supplied). The California State Court Action was disclosed as a completed lawsuit in the worksheet, although without a case number, and Connaughton was identified as a collection agency for his client, the University of California, Irvine. Connaughton's business address was also included on the worksheet. (Joint Exhibit 6).

Subsequent written communications between the Debtor and Miller also reflect that the Debtor informed Miller of the judgment with a view to disclosing the debt on her bankruptcy schedules. On September 30, 2002, the Debtor wrote Miller that she was "dealing with an enormous amount of fees," and that she "just cannot afford to take any chances on this kind of a judgment." (Joint Exhibit 22; Trial Exhibit 411). Later, on December 3, 2002, the Debtor wrote Miller of her hope that "the correction for the $1,000,000 judgment and attorney fee award was already registered with the court." (Joint Exhibit 22; Trial Exhibit 431). Addition-

ally, on December 16, 2002, Miller sent the Debtor an email in which he wrote:

[Y]our concern and top priority has always been to get the bankruptcy filing done as quickly as possible so as to prevent your employer from being notified of the various claims against you, the 1.1 million for [sic] judgment for the failed sexual harassment claim, and the stigma it may attach to you with your new employer.

(Debtor's Exhibit 56). The email also refers to the "California matter," and the results of Miller's research regarding the dischargeability of the claim.

In other words, the evidence shows that the Debtor informed Miller of the judgment debt in connection with the filing of her bankruptcy case, and the written communications between them indicate that the Debtor provided the information for the purpose of disclosing it on her schedules. The written communications do not reveal any scheme to conceal or purposely omit the Plaintiff from the Debtor's list of creditors.

After providing the information, the Debtor testified that she relied on Miller to serve her creditors with notice of the bankruptcy case. Specifically, the Debtor testified that she understood that Miller "would notify every one of my people that I owed money to or had a judgment against me." (Transcript, p. III–103). She further testified that she had provided Miller with Connaughton's name and business address, and believed that she had complied with her obligation to furnish all of the information necessary to notify her creditors. (Transcript, p. II–117).

Miller does not specialize in the practice of bankruptcy law, and has not filed a bankruptcy petition on behalf of a client since representing the Debtor in this case. (Transcript, pp. IV–137, IV–147). Miller

testified, however, that he expected the bankruptcy laws to change in October of 2002, and understood that the new laws would make it more difficult to qualify for Chapter 7 relief. Consequently, Miller filed the Debtor's petition and incomplete schedules on September 30, 2002, before the anticipated change, with the intention of filing amended schedules on a later date. (Transcript, pp. IV–130–31, IV–146).

Amended schedules were filed on December 5, 2002. On the amended schedules, the Debtor listed "E. Joseph Conninghton," at Connaughton's business address, as a creditor holding an unsecured claim in the amount of $1,100,000.00. As she was reviewing the amended schedules, the Debtor testified that she flipped through the paperwork to see where Connaughton's name was placed, "because that was the most important thing for me," and saw that Connaughton's name and address appeared on the amendment. (Transcript, p. II–117).

Miller testified that it is his practice to mail such amendments to creditors who are added or affected by the filing, and that he remembers mailing the amendments filed on December 5 to the creditors listed on the mailing matrix. (Transcript, pp. IV–157–59, IV–170). No certificate of service appears in the record, however, and the Court entered an Order striking the Amendment on December 20, 2002.

It appears that the Debtor received a copy of the Order Striking Amendment on January 7, 2003. (Joint Exhibit 22; Trial Exhibit 437; Debtor's Exhibit 110). Her response to the Order indicates that the Debtor had believed, until January 7, 2003, that Connaughton and the creditors listed on the Amendment had been notified of the bankruptcy. (Transcript, pp. II–126, III–103). In an email to Miller dated January 7, 2003, she wrote:

> Today, I received an order striking the amendment filed on Dec. 5. The date of this order is Dec. 20. It shows that you have been served with this notice. This is truly preposterous—here I am thinking that the creditors were already served and did not respond all this time. . . .
>
> Please respond to me immediately to confirm that you have effectuated the proper filing of the papers with the right amount and the proper proof of service on the creditors.

(Joint Exhibit 22; Trial Exhibit 437; Debtor's Exhibit 110). In subsequent emails dated January 13, 2003, January 20, 2003, and January 22, 2003, the Debtor again asked Miller whether her creditors had been properly served with notice of the bankruptcy. (Joint Exhibit 22; Debtor's Exhibit 110). Finally, on February 4, 2003, the Debtor wrote to Miller:

> However, you still have not told me the answer to the one question I have been asking—with respect to the attorneys who have a 1.1 million dollar judgment on my head—when is the deadline for them to respond? When were they served and how long do they have from the time of service to contest?

(Debtor's Exhibit 57). The chain of correspondence evidences the Debtor's surprise and concern upon learning that her creditors had not received notice of the bankruptcy before January of 2003. Had the Debtor intended to exclude her primary creditor from the bankruptcy filing, it is unlikely that her correspondence would have reflected such alarm by the failure of service.

As a final point, the Court notes that the Debtor's February 4 email to Miller refers to "attorneys" as holding the judgment for $1,100,000.00. (Debtor's Exhibit 57). The reference is consistent with the Debtor's

inclusion of Connaughton on the worksheet that was submitted to Miller before the petition was filed, and is also consistent with the cover letter mailed with the worksheet, in which the Debtor expressed her fear that the "California attorneys" will spread information that *"they* have a $1.1 million judgment against me." (Joint Exhibit 6)(Emphasis supplied). Connaughton, an attorney, was listed as an unsecured creditor on the Debtor's initial amended schedules filed in her bankruptcy case.

The Final Order Entering Costs, of course, was entered in favor of the party-defendants, and not their attorneys, in the State Court Action. (Joint Exhibit 1). For purposes of this bankruptcy case, therefore, the Debtor's creditor is the Regents of the University of California, and not Connaughton as the University's attorney. Consequently, Connaughton was improperly identified as the creditor on the initial amended schedules filed by the Debtor.

Despite the error, however, the Court finds that it was reasonable for the Debtor to believe that Connaughton was the holder of the judgment. The Debtor explained her belief as follows:

Q: Okay. Why did you think the University—not the University, but why did you think the lawyers had a judgment against you for $1.1 million?

A: Because it was attorney's fees. It was an attorney's fees judgment.

Q: Okay. I don't see in this letter that the University has a judgment?

A: I'm sorry?

Q: I don't see in this letter that the University has a judgment. You're pointing out that the lawyers—

A: Because the judge that entered that judgment, he entered it under attorney's fees. He said it was an attorney fee award. It was attorney's fees, for whatever stuff that they submitted to the Judge.

Q: All right. So is it your understanding at that time that the lawyers were the ones that were entitled to pursue this matter?

A: It was my understanding that the lawyers held the judgment.

Q: Okay.

A: The $1.1 million judgment. That was my understanding. And specifically I looked at it as Connaughton because he was the one who did the motion to the Judge to get the attorney's fees. (Transcript, pp. III–89–90).

Based on the testimony and documentary evidence, the Court finds that the Debtor's mistaken belief regarding the identity of the judgment creditor was reasonable. The erroneous inclusion of Connaughton on her paperwork does not evidence the Debtor's intention to omit the true creditor from her bankruptcy schedules. In fact, Miller testified that the Debtor "was as surprised as I was that Connaughton and his firm were not the judgment holders. And I believe that to this day, until she finally saw a judgment, she would have thought it was Connaughton. Obviously, if she wanted to keep them in the dark, why would she have me serve their lawyers, you know." (Transcript, p. IV–175).

In summary, the Court finds that the Debtor satisfied her burden of proving that the failure to list the Plaintiff on her bankruptcy schedules was not due to fraud or intentional design. The Debtor's primary purpose in filing the bankruptcy case was to obtain a discharge of the judgment debt, and she informed her attorney of the existence of the judgment for the purpose of disclosing it on her schedules. Although errors may have occurred in identifying and serving the Plaintiff as the primary creditor in her case, the evidence

does not establish that the Debtor intentionally or fraudulently excluded the Plaintiff from her bankruptcy schedules.

### Conclusion

The matter before the Court is an action to determine the dischargeability of a judgment debt pursuant to § 523(a)(3)(B) of the Bankruptcy Code. A final evidentiary hearing was conducted to consider two issues arising under that section and the decision of the Eleventh Circuit Court of Appeals in *Samuel v. Baitcher,* 781 F.2d 1529 (11th Cir.1986).

With respect to the first issue, the Court finds that the Debtor did not satisfy her burden of proving that the Plaintiff had notice or actual knowledge of the bankruptcy case in time to file a timely dischargeability complaint. The Plaintiff was not listed on the Debtor's initial schedules, and the Court's records do not reflect that the Plaintiff was served with notice of the Debtor's bankruptcy case prior to the deadline for filing such complaints. Further, the Debtor did not establish that the Plaintiff had actual knowledge of the bankruptcy case by virtue of a letter written by her on October 3, 2002.

With respect to the second issue, the Court finds that the Debtor satisfied her burden of proving that the failure to list the Plaintiff as a creditor on her bankruptcy schedules was not due to fraud or intentional design. The Debtor's primary purpose in filing the bankruptcy case was to discharge the judgment debt, and the Debtor informed her bankruptcy attorney of the existence of the judgment for the purpose of disclosing it on her schedules. Under the circumstances presented, the errors in identifying and serving the Plaintiff as the judgment creditor do not evidence the Debtor's improper motive or intent.

Accordingly:

**IT IS ORDERED** that:

1. The Plaintiff, the Regents of the University of California, did not have notice or actual knowledge of the bankruptcy case of the Debtor, Christina Paylan, in time to file a timely dischargeability action pursuant to 11 U.S.C. § 523(a)(6).

2. The failure to schedule the debt owed by the Debtor, Christina Paylan, to the Plaintiff, the Regents of the University of California, was not due to fraud or intentional design on the part of the Debtor.

3. The Court will schedule a Status Conference in this adversary proceeding by separate Order.